RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206
File Name: 10a0016p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

KARIM KOUBRITI,

*Plaintiff-Appellee,*

*v.*

No. 09-1016

RICHARD CONVERTINO,

*Defendant-Appellant,*

MICHAEL THOMAS,

*Defendant.*

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 07-13678—Marianne O. Battani, District Judge.

Argued: October 14, 2009

Decided and Filed: February 3, 2010

Before: KENNEDY and ROGERS, Circuit Judges; HOOD, District Judge.[*]

_____

## COUNSEL

_____

**ARGUED:** Robert S. Mullen, ROBERT S. MULLEN AND ASSOCIATES, PLLC, Plymouth, Michigan, for Appellant. Ben M. Gonek, LAW OFFICE, Detroit, Michigan, for Appellee. **ON BRIEF:** Robert S. Mullen, ROBERT MULLEN AND ASSOCIATES, PLLC, Plymouth, Michigan, for Appellant. Ben M. Gonek, LAW OFFICE, Detroit, Michigan, for Appellee.

_____

## OPINION

_____

KENNEDY, Circuit Judge. Defendant-Appellant Richard Convertino appeals the district court's partial denial of his motion to dismiss for failure to state a claim in

---

[*]The Honorable Joseph M. Hood, United States District Judge for the Eastern District of Kentucky, sitting by designation.

this civil action filed against him by Plaintiff-Appellee Karim Koubriti. Koubriti seeks monetary damages from Convertino, pursuant to *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971), for constitutional violations that Convertino allegedly committed while serving as the Assistant United States Attorney who prosecuted Koubriti for conspiracy to provide material support or resources to terrorists in violation of 18 U.S.C. §§ 371 and 2339A, and conspiracy to engage in fraud or misuse of visas, permits, or other immigration documents in violation of 18 U.S.C. §§ 371 and 1546(a). Because 1) Plaintiff has pointed to no harm to himself from the investigation Convertino conducted except the non-disclosure of certain exculpatory evidence at trial, and 2) Convertino is shielded by prosecutorial immunity for such non-disclosures of exculpatory evidence, we REVERSE the decision of the district court denying in part Convertino's motion to dismiss and AFFIRM its decision to the extent that it granted Convertino's motion in part.

## FACTUAL AND PROCEDURAL BACKGROUND

On September 17, 2001, in response to the September 11, 2001, terrorist attacks, a team of federal agents went to a house at 2653 Norman Street in Detroit in an attempt to interview one Nabil Al-Marabh, an individual on the FBI's "watch list" of suspected terrorists.[1] Upon entering the house, the agents found Plaintiff Karim Koubriti, Ahmed Hannan, and Farouk Ali-Haimoud. A subsequent search of the house turned up false identity documents for each occupant, as well as "over 100 audio tapes featuring fundamentalist Islamic teachings, a videotape depicting a number of American tourist landmarks, and a day planner bearing suspicious drawings labeled 'The American Base

---

[1]These facts, as well as the vast majority of other facts stated in this opinion, come from an exhibit that was attached to Koubriti's First Amended Complaint. The exhibit–titled "Government's Consolidated Response Concurring in the Defendants' Motions for a New Trial and Government's Motion to Dismiss Count One Without Prejudice and Memorandum of Law in Support Thereof"–was originally filed by the government in response to the motion for a new trial that Koubriti filed in his underlying criminal case, *United States v. Koubriti*, Case No. 01-80778 (E.D. Mich.). The district court relied on this document for its version of the facts, and both parties rely heavily on it for presentation of the facts of the case to this Court. "[D]ocuments attached to the pleadings become part of the pleadings and may be considered on a motion to dismiss." *Commercial Money Ctr., Inc. v. Illinois Union Ins. Co.*, 508 F.3d 327, 335 (6th Cir. 2007) (citing Fed. R. Civ. P. 10(c)).

in Turkey under the Leadership of Defense Minister,' and 'Queen Alia, Jordan.'"[2] *United States v. Koubriti*, 199 F. Supp. 2d 656, 659 (E.D. Mich. 2002). All three men were arrested, and each was charged the next day with possession of false identification and/or immigration documents in violation of 18 U.S.C. §§ 1028(a)(4), 1546, and 371.[3] Responsibility for prosecution of the case was assigned to Defendant Richard Convertino, then an Assistant United States Attorney for the Eastern District of Michigan. Convertino, along with FBI Agent Michael Thomas and others, began investigating the men for any ties to terrorist organizations or activities. Convertino eventually developed a theory that the men–along with Abdel Ilah El Mardoudi–were a "cell" or "sleeper cell" of an Islamic terrorist organization aiming to assist a transnational network of radical Islamists influenced by the Salafiyya religious movement. Based on his theory, Convertino caused the filing of a second[4] and then third[5] superseding indictment against Koubriti and the others which added to the existing charges a count of conspiracy to provide material support or resources to terrorists in violation of 18 U.S.C. §§ 371 and 2339A.

At Koubriti's criminal trial, the government relied on three different types of evidence to establish its terrorism case: 1) expert testimony that the day planner sketches and videotape seized from the Norman house constituted terrorist "casing"[6] material; 2) the testimony of Koubriti's former housemate, Yousseff Hmimssa, that the defendants indeed had terrorist leanings and intentions; and 3) corroborating evidence that the

---

[2]The government would later allege that these two sketches, respectively, were of a hardened air shelter at the United States Air Base in Incirlik, Turkey, and of the U.S.-operated Queen Alia military hospital in Amman, Jordan.

[3]On September 27, 2001, an indictment returned on the same charges. Youseff Hmimssa, a former housemate of the men, was also named as a codefendant in this indictment. However, the charges against him were later severed because of his agreement to cooperate with the government and testify against his fellow defendants. *See United States v. Koubriti*, 307 F. Supp. 2d 891, 894 n.1 (E.D. Mich. 2004). This occurred sometime in March 2002, prior to the Second Superseding Indictment.

[4]Abdella Lnu and Youseff Hmimssa were also named in this indictment.

[5]El Mardoudi was also added as a codefendant in this indictment.

[6]Both Koubriti and Convertino (as well as the government in the Koubriti's criminal case) use this term in their briefs to describe this evidence. The parties appear to use this term to suggest that the material was specifically being used to help the defendants develop and plan their intended attacks.

defendants had committed acts consistent with terrorist activities, such as committing document and credit fraud, attempting to obtain commercial truck licenses for transporting hazardous materials, possessing audio tapes of fundamentalist speakers, and making international wire transfers. On June 3, 2003, after a trial spanning three months, a jury convicted Koubriti of Count I (conspiracy to provide material support or resources to terrorists) and Count II (conspiracy to engage in fraud and misuse of visas, permits, and other documents).[7]

On October 15, 2003, Koubriti and the other defendants filed a Motion for New Trial on the grounds that the government suppressed material evidence contrary to *Brady v. Maryland*, 373 U.S. 83 (1963). Motion for New Trial, *United States v. Koubriti*, Case No. 01-80778 (E.D. Mich. Oct. 15, 2003). On December 12, 2003, the trial court held a hearing regarding the claim and found that two previously undisclosed documents in the possession of the government constituted material evidence that should have been disclosed to the defense. Accordingly, the court ordered the government to conduct a full and independent review of its case files to determine if there were other documents that should have been disclosed pursuant either to *Brady* or *Giglio v. United States*, 405 U.S. 150 (1972). On June 29 and August 30, 2004, the government disclosed numerous additional documents that had not previously been submitted or shown to Koubriti and the other defendants.

On August 31, 2004, the government filed a further response to Koubriti's motion which concurred in the request for a new trial and asked the court to dismiss the terrorism count without prejudice. In its brief to the court, the government provided a detailed description of several instances where it had failed to disclose relevant, exculpatory, or otherwise discoverable material. With respect to the alleged casing materials, the government acknowledged several material non-disclosures, including: 1) photographs of the Queen Alia hospital that had been taken by a government agent investigating in Jordan; 2) statements disclosing that there was not a consensus among

---

[7]El Mardoudi was also convicted of both counts. Hannan was convicted of document fraud, but not of the terrorism charge. Ali-Haimoud was acquitted of all charges.

government officials that any of the sketches represented the hospital; 3) that some government experts believed that the videotape was not casing material; 4) that there was no consensus that any of the sketches represented a hardened air shelter at the Incirlik Air Base; and 5) that some agents actually believed that the drawings merely represented a map of the Middle East. The government also acknowledged that Convertino had traveled to Jordan with Agent Thomas in late Febraury 2002 to visit the sites allegedly depicted by the day planner sketches. With respect to Yousseff Hmimssa's testimony, the government again acknowledged several material non-disclosures, including: 1) a letter from a prison inmate indicating that Hmimssa had bragged to him while they were both incarcerated that he had fooled the FBI and the Secret Service; 2) other documentation indicating that, contrary to his testimony, Hmimssa harbored deep-seated anti-American views; and 3) that Convertino and other officials interviewed Hmimssa more than ten times prior to trial and that Convertino "made a deliberate decision not to have the FBI take any notes or prepare any memoranda of these sessions in order to limit defense counsel's ability to cross-examine Hmimssa." Finally, with regard to the government's corroborating evidence, the government again acknowledged that it had failed to disclose certain material evidence.

The trial court in Koubriti's criminal trial dismissed the defendants' terrorism charge without prejudice and granted a new trial as to the fraud count. *United States v. Koubriti*, 336 F. Supp. 2d 676 (E.D. Mich. 2004). Koubriti was released on bond on October 12, 2004 and is now under the supervision of Pretrial Services. The government has since filed a new indictment against Koubriti, charging him solely with conspiracy to commit mail fraud in violation of 18 U.S.C. § 371.

Following the dismissal, Convertino was indicted on charges of conspiracy to obstruct justice and make false declarations in violation of 18 U.S.C. § 371, obstruction of justice in violation of 18 U.S.C. §§ 2 and 1503, making a materially false declaration before a court in violation of 18 U.S.C. §§ 2 and 1623, and obstruction of justice in violation of 18 U.S.C. § 1503 based on his conduct at the trial. On October 31, 2007, Convertino was acquitted of all counts. The Michigan Attorney Grievance Commission

also investigated Convertino's actions relating to the Koubriti case, but it did not bring any disciplinary charges.

On August 30, 2007, Koubriti filed the present action. In his complaint–which named Convertino, Thomas, and Ray Smith[8] as co-defendants–Koubriti seeks relief pursuant to the Fifth Amendment and *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, 403 U.S. 388 (1971). Koubriti requested $9,000,000 in compensatory damages plus punitive damages arguing that:

> Defendants violated his Fifth Amendment Rights by maliciously and intentionally withholding exculpatory evidence and fabricating evidence contrary to *Brady v. Maryland*, 373 U.S. 83, 87 (1963), prior to and during his prosecution for the offense of conspiracy to provide materials for or resources to terrorists contrary to 18 U.S.C. §§ 371 and 2339(e).

The complaint then sets out the following claims with respect to Convertino's liability:

> Defendant Convertino while acting in an investigative type role withheld exculpatory evidence or fabricated evidence in the Plaintiff's criminal case by:
>
> A.     Failing to turn over photographs of the Queen Alia Hospital or ordering that they not be turned over to the Defendant or presented to the Grand Jury;
> B.     Failing to disclose that none of the Defendants could not [sic] establish which site or sites the sketches established (if either) after their respective trips to Jordan;[9]
> C.     Ordering or directing Defendant Thomas not to memorialize any of the ten to twenty interviews of Yousif Hnimssa [sic] prior to the Second Superseding Indictment being issued; and
> D.     Failing to disclose the Opinion of Air Force OSI SA Goodnight to the Grand Jury or Plaintiff concerning the alleged Incirlik Air Base sketches.

---

[8]Smith was a State Department officer stationed in Jordan who was present during Thomas and Convertino's trip to Jordan.

[9]Because this statement is somewhat unclear, it bears noting that there was only one trip to Jordan, which Thomas and Convertino made together. Ray Smith was also present during the trip because he was stationed in Jordan as an officer for the State Department.

On May 9, 2008, Convertino filed a Motion to Dismiss Pursuant to Fed. R. Civ. P. 12(b)(6) for Failure to State a Claim Upon Which Relief Can Be Granted. In his brief supporting the motion, Convertino argued that alternative forms of relief and other special factors counseled against recognizing a *Bivens* remedy at all, and in the alternative, that as prosecutor he was entitled to absolute immunity from the claims.

On December 3, 2008, the district court denied Convertino's motion to dismiss the case. Addressing the immunity issue first, the court found that several of the allegations did in fact fall within the absolute immunity doctrine: specifically, the claim that Convertino failed to turn over government photographs of the Queen Alia Hospital as well as the claim that Convertino failed to disclose the opinions of government agents regarding the alleged Incirlik Air Base sketches. The court found that the rest of the allegations of the First Amended Complaint referred to actions by Convertino that were investigatory in nature and thus not entitled to absolute immunity. The court suggested that Convertino would only have qualified immunity for these claims. It did not analyze the claims under the qualified immunity standard, however. Rather, it ruled that "dismissal at this procedural juncture [would be] premature." Finally, the court ruled that Koubriti's Fifth Amendment Due Process claims were cognizable as the basis for a *Bivens* action because alternative remedies were insufficient to protect Koubriti's interests and because it did not believe there were any special factors counseling against recognizing the cause of action in this case.

Accordingly, the court denied Convertino's motion to dismiss. This appeal followed. Koubriti has not cross-appealed the district court's ruling that the allegations other than ¶¶ 27 B and C were barred by absolute immunity. Consequently, the only questions we have before us are whether the remaining allegations are barred by absolute prosecutorial immunity or qualified immunity and, if not, whether a *Bivens* remedy should even be recognized for these alleged constitutional violations.

**JURISDICTION/STANDARD OF REVIEW**

This case comes to us on a denial of a motion to dismiss, a posture which is not normally appealable to this Court. "A district court's denial of a claim of qualified immunity, [however,] to the extent that it turns on an issue of law is an appealable final decision within the meaning of 28 U.S.C. § 1291, notwithstanding the absence of a final judgment." *Mitchell v. Forsyth*, 472 U.S. 511, 530 (1985); *see also Carvajal v. Dominguez*, 542 F.3d 561, 566 (7th Cir. 2008) (quoting *Mitchell*, 472 U.S. at 530). Furthermore, as the Seventh Circuit has noted:

> The Supreme Court recently clarified that the scope of [the collateral order] doctrine includes jurisdiction over whether 'to devise a new *Bivens* damages action' and explained:
>
> > We recognized just last Term that the definition of an element of the asserted cause of action was "directly implicated by the defense of qualified immunity and properly before us on interlocutory appeal." *Hartman v. Moore*, 547 U.S. 250, 257 n.5 . . . (2006). Because the same reasoning applied to the recognition of the entire cause of action, the Court of Appeals had jurisdiction of this issue, as do we.

*Carvajal*, 542 F.3d at 566 (quoting *Wilkie v. Robbins*, 551 U.S. 537, 550 n.4 (2007)); *see also Moldowan v. City of Warren*, 578 F.3d 351, 374 (6th Cir. 2009) (finding jurisdiction to review denial of summary judgment in case asserting a § 1983 claim against state police officers because qualified immunity was at stake). Thus, we have jurisdiction over the questions presented by Convertino in this appeal, and we will review the district court's decisions *de novo*. *See Moldowan*, 578 F.3d at 374 ("Whether a defendant is entitled to absolute or qualified immunity from liability . . . is a legal question that this Court reviews *de novo*.").

**ANALYSIS**

**I.**

Koubriti's first allegation not dismissed by the district court is that he is entitled to civil damages under *Bivens* on the ground that Convertino "failed to disclose, during Koubiriti's criminal trial, the fact that the government could not establish which site or sites the day planner sketches represented (if either) during their trips to Jordan." In response, Convertino argues that he is entitled to absolute immunity that bars him from any potential civil liability related to this failure. We find that Convertino has the better argument.

Under the *Bivens* line of cases, the Supreme Court has recognized a cause of action against federal officials for certain constitutional violations when there are no alternative processes to protect the interests of the plaintiff and no special factors counseling against recognizing the cause of action. *Wilkie*, 551 U.S. at 550. On the other hand, government officials generally enjoy a presumption of qualified immunity from civil lawsuits, such that they are "shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Wilson v. Layne*, 526 U.S. 603, 609 (1999) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)) (internal quotation marks omitted). Furthermore, officials enjoy absolute immunity from civil liability related to their performance of "prosecutorial" functions. *See Burns v. Reed*, 500 U.S. 478, 486 (1991). The burden of proof is on the official seeking absolute immunity, however, to prove that the behavior in question falls in the category of behavior that merits this higher level of protection. *Id.*

In *Burns v. Reed*, the Supreme Court mandated that courts use a "functional approach" when determining whether a government official's actions fit within the category of actions traditionally entitled to absolute immunity. *Id.* Using this approach, courts must look to "the nature of the function performed, not the identity of the actor who performed it." *Forrester v. White*, 484 U.S. 219, 229 (1988). Functions that serve

as an "integral part of the judicial process" or that are "intimately associated with the judicial process" are absolutely immune from civil suits. *Imbler v. Pachtman*, 424 U.S. 409, 430 (1976). Meanwhile, functions which are more "investigative" or "administrative" in nature, because they are more removed from the judicial process, are subject only to qualified immunity. *Burns*, 500 U.S. at 486. Although "[t]he line between a prosecutor's advocacy and investigating roles might sometimes be difficult to draw," *Zahrey v. Coffey*, 221 F.3d 342, 347 (2d Cir. 2000), we are not without some guidance to help determine where that line should be drawn. For example, conduct by a prosecutor that is nonetheless investigative or administrative in function includes: "giving legal advice to police," *Spurlock v. Thompson*, 330 F.3d 791, 798 (6th Cir. 2003); making "out-of-court statements" at a press conference, *Buckley v. Fitzsimmons*, 509 U.S. 259, 277-78 (1993); making statements "in an affidavit supporting an application for an arrest warrant," *Fletcher v. Kalina*, 522 U.S. 118, 139 (1977); and "authorizing warrantless wiretaps in the interest of national security," *Mitchell*, 472 U.S. at 520. On the other hand, prosecutors have absolute immunity from "suits for malicious prosecution and for defamation, and . . . this immunity extend[s] to the knowing use of false testimony before the grand jury and at trial." *Burns*, 500 U.S. at 484. Likewise, they have absolute immunity for the following actions: appearances at probable cause and grand jury hearings, *Spurlock*, 330 F.3d at 797; evaluation of evidence and presentation of that evidence at pre-trial and trial proceedings, *id.*; and preparation of witnesses for trial, *id.*

Finally, and most importantly to our review here, prosecutors have absolute immunity from civil liability for the non-disclosure of exculpatory information at trial. *Imbler*, 424 U.S. at 431 n.34. In *Imbler*, the Supreme Court equated the non-disclosure of exculpatory information with the use of perjured testimony and ruled that evidence suppression should be equally protected by absolute immunity. *Id.* Even though such behavior is "reprehensible, warranting criminal prosecution as well as disbarment," the Court found that allowing civil actions for such allegations would "weaken the adversary system at the same time it interfered seriously with the legitimate exercise of prosecutorial discretion." *Id.* This Court's decision in *Jones v. Shankland*, 800 F.2d 77,

80 (6th Cir. 1986), is also helpful to our review. In *Jones*, the plaintiff brought a § 1983 action[10] against multiple county officials for numerous alleged violations relating to the plaintiff's trial and conviction for second-degree murder–a conviction which was later overturned on federal habeas review when it was determined that the prosecution had refused to disclose an eyewitness statement that made no mention of the plaintiff being involved in the shooting. In his civil complaint, the plaintiff there alleged that three county prosecutors were liable for failing to disclose exculpatory information, including, but not limited to, the aforementioned witness statement. Based on these allegations, this Court had no problem finding "that the individual county prosecutors were absolutely immune from personal liability in damage suits . . . ." *Id.* According to the panel, the plaintiff's claims were "*clearly* within the scope of immunity contemplated by the Supreme Court in *Imbler*." *Id.* (emphasis added). "The . . . non-disclosure of exculpatory information [is] certainly entitled to absolute immunity." *Id.*

We fail to see how *Imbler* and *Jones* are distinguishable in any functional way from Koubriti's claim in the instant case that Convertino failed to disclose the lack of consensus among government officials as to what the sketches depicted. In the relevant portion of Koubriti's complaint, Koubriti alleges that he is entitled to *Bivens* relief because "Defendant Convertino . . . withheld exculpatory evidence . . . by: . . . B. Failing to disclose that [Convertino, Thomas, and Smith] could not establish which site or sites the sketches established (if either) after their respective trips to Jordan." As stated, this is nothing more than an accusation that Convertino failed to disclose exculpatory evidence. As such, the claim fits squarely in the framework set out by *Imbler* and *Jones* and is thus covered by absolute immunity.

Koubriti attempts to distinguish his claim by focusing on the circumstances surrounding the *acquisition* of the alleged exculpatory information produced by Convertino's investigation instead of the actual non-disclosure of the information. In his brief to this court, Koubriti highlights the fact that Convertino traveled to Jordan

---

[10]The Supreme Court has ruled that "the qualified immunity analysis is identical" under § 1983 causes of action and *Bivens* causes of action. *Wilson*, 526 U.S. at 609.

some fifteen months before the trial began and investigated the buildings allegedly depicted in the day planner sketches. The district court, in agreeing with Koubriti, stated that "immunity cannot extend to actions by a prosecutor that violate a person's substantive due process rights by obtaining, manufacturing, coercing or fabricating evidence before filing formal charges, even if the subsequent use of that evidence is protected by absolute immunity." The argument made by Koubriti and the district court fails to recognize that Koubriti is not requesting relief for some alleged violation that took place during Convertino's trip to Jordan. There is nothing in the complaint to suggest that Koubriti is arguing that he is entitled to relief here because of some due process violation Convertino committed while he investigated the case in Jordan.[11] That would be a different claim, one that would no doubt *not* need to rely on *Brady*. Instead, what we have in the instant case is an allegation that relies on *Brady*–a case dealing with the non-disclosure at trial of exculpatory information–and is based on the non-disclosure of a pertinent fact, not the underlying investigation itself. There is no claim here of evidence fabrication, and it is not the evidence that resulted from the trip of which Koubriti complains. Indeed, it was that evidence which, when finally disclosed, *benefitted* Koubriti in obtaining dismissal of his conviction. It was the failure to produce this favorable evidence resulting from the trip so that Koubriti could have relied on it at trial to undermine the government's claim that is the alleged violation underlying this claim.

The very same policy reasons undergirding the Supreme Court's decision in *Imbler* also counsel in favor of recognizing absolute immunity here. Since prosecutors are almost always involved with the police's investigation of crimes, denying absolute immunity in cases such as this would likely "eviscerate" the absolute immunity in traditional non-disclosure claims that the Supreme Court has already decided to protect. *Imbler*, 424 U.S. at 431 n.34. Likewise, it would "weaken the adversarial system" and interfere with prosecutorial discretion much in the same way that caused the *Imbler*

---

[11]The district court refers to a general due process violation but never specifically explains or even identifies what that violation was. Plaintiff's complaint does not allege a due process violation aside from the *Brady* violations.

Court to rule in favor of granting immunity. *See id.* Since Plaintiff's claim (and underlying harm) is only related to the non-disclosure and not the underlying investigation, the *Imbler* and *Jones* dispositions lead us to the conclusion that Convertino has absolute immunity from this claim.

## II.

The district court also allowed Koubriti to proceed on his *Bivens* claim relating to the allegation that Convertino directed FBI Agent Thomas not to memorialize interviews by Convertino and Thomas of Yousseff Himimssa leading up to trial. Convertino again argues that he is entitled to absolute immunity from this claim, while Koubriti argues that Convertino's relevant behavior was investigative in nature and thus not entitled to absolute immunity.

In denying the government's motion as to this claim, the district court stated that "[t]he instruction by Convertino not to record witness interviews,[12] falls outside the bounds of trial preparation." In reaching this conclusion, the district court cited to district court and court of appeals decisions from outside this Circuit for the general proposition that prosecutors are only entitled to qualified immunity when providing legal advice to police and other government agents. It thus appears that the district court considered Koubriti's claim as one alleging a general due process violation independent of *Brady* and its progeny. We view the claim differently. Looking to Koubriti's First Amended Complaint filed in the district court, Koubriti specifically alleges the following: "Defendant Convertino while acting in an investigative type role withheld exculpatory evidence or fabricated evidence in the Plaintiff's criminal case by: . . . C. Ordering Defendant Thomas not to memorialize any of the ten to twenty interviews of Yousif Hnimssa [sic] prior to the Second Superseding Indictment being issued . . . ." Koubriti also lays out the basis of his claims on page 3 of the complaint:

---

[12]The district court uses the term "record witness interviews" here notwithstanding the fact that Koubriti, in his complaint, characterizes the allegation as a failure to "memorialize" the interviews. To the extent that there is a different between the failure to record the interviews and the failure to memorialize them, Plaintiff has only alleged the failure to memorialize the interviews. Our analysis relies on that assumption.

> Specifically, Plaintiff is claiming that the named Defendants violated his Fifth Amendment Rights by maliciously and intentionally withholding exculpatory evidence and fabricating evidence[13] contrary to *Brady v. Maryland*, 373 U.S. 83, 87 (1963), prior to and during his prosecution for the offense of conspiracy to provide materials for or resources to terrorists contrary to 18 USC 371 and 2339(e).

Viewing these statements together, it seems clear that Koubriti is actually alleging a simple *Brady*-related violation in the form of non-disclosure of the statements Hmimssa made to federal officials in his multiple interviews.[14] Koubriti has not asked this Court to recognize Convertino's actions here as a freestanding due process violation independent of *Brady*. Instead, he consistently relies on *Brady* to support his claim, a case which addresses the non-disclosure of exculpatory evidence from the defense *at trial*. *Brady* does not provide guidance as to the constitutional limits of a prosecutor's behavior during the investigation of a crime. Therefore, it seems clear to this Court that Koubriti's claim here amounts to an attempt to seek damages for a traditional *Brady* violation, i.e. failing to disclose the contents of the various interviews in question.

When Koubriti's claim is characterized as a traditional *Brady* violation, it becomes clear that Convertino is entitled to absolute immunity from civil liability relating to this claim as well. In fact, the immunity analysis is no different than it was for the previous claim. Just as we stated above, *Jones* and *Imbler* make clear that absolute immunity protects a prosecutor from civil liability for the non-disclosure of material exculpatory evidence at trial. *See Imbler*, 424 U.S. at 431 n.34; *Jones*, 800 F.2d at 80. Therefore, absolute immunity also shields Convertino from this claim.

---

[13]Although Plaintiff makes this statement in ¶ 9 of the complaint, he does not identify the "fabricated evidence" alleged there or elsewhere. With respect to the interviews of Hmimssa, there is only the claim of preventing the creation of evidence for probable impeachment of that witness.

[14]Not surprisingly, Koubriti has also made attempts to characterize the claim as something other than a traditional *Brady* violation. In so doing, he was able to make Convertino's underlying behavior seem more investigative in nature, which would allow him to avoid the absolute immunity hurdle. Koubriti cannot, however, have it both ways. Either he must state a *Brady* violation as the basis for this part of his *Bivens* action–which must rely on some sort of non-disclosure of evidence by the prosecutor–or he must state a freestanding Fifth Amendment due process violation independent of *Brady* and its progeny–which could then rely on the prosecutor's directive to the agents not to memorialize the interviews. These are two distinct claims which require different substantive and legal analysis.

Even if we were to somehow recognize this claim as one of something other than a mere *Brady* non-disclosure allegation, we would still find that Convertino has immunity sufficient to bar this action from proceeding. Assuming *arguendo* that Convertino's relevant behavior (i.e. his direction to federal agents, rather than his non-disclosure at trial) is "administrative" conduct covered only by qualified immunity,[15] that immunity still completely shields Convertino from liability unless 1) he committed a constitutional violation, and 2) the right that was violated was a clearly established right of which a reasonable person would have known. *Harlow*, 457 U.S. at 818. Whether Koubriti's allegation, when characterized as a more general due process claim, amounts to a constitutional violation has not been developed in the lower court record, nor has it been briefed to this Court. Therefore, it would be improper to reach the merits of this question. *See, e.g.*, *Citizens Coal Council v. EPA*, 447 F.3d 879, 905 (6th Cir. 2006) (en banc) ("In short, the panel majority erred in ruling on grounds not raised by the parties. Because it was improper for the panel majority to reach issues not briefed by the parties, . . . we decline to reach those issues here."). Since the Supreme Court's decision in *Pearson v. Callahan*, however, we are no longer required to address the constitutionality of the alleged conduct first and can resolve the issue by determining whether such a violation was clearly established. 129 S. Ct. 808, 818 (2009).

In the instant case, even if the claim were to be characterized as one alleging that Convertino violated Koubriti's right to due process by ordering agents not to memorialize the Hmimssa interviews, we could not say that it was clearly established that such behavior is unconstitutional. "In determining whether a right is clearly established, we 'may rely on decisions of the Supreme Court, decisions of this court and

---

[15] Although we assume this conduct is "investigative" here for the purposes of this analysis, we do not endorse that assumption. Any attempt by Koubriti to characterize Convertino's directives as "administrative" or "investigative" is no different than the argument rejected by the Supreme Court in *Imbler*. In that case, the relevant conduct was the prosecutor's request to police not to question a testifying witness about an unrelated charge until after that witness completed his testimony at trial. *Imbler*, 424 U.S. at 431 n.32. In rejecting the petitioner's contention that that conduct was "investigative," the Court stated: "Seen in its proper light, . . . [the prosecutor's] request of the officers was an effort to control the presentation of his witness' testimony, a task fairly within his function as an advocate." *Id.* This same logic arguably applies to the case now before us. Convertino's directive was part of his effort to prepare for trial and to control how his witness' testimony would play out at the trial. *See id.* As alleged, this conduct is questionable. Nevertheless, a prosecutor's conduct in his role as an advocate is protected by absolute immunity, *see Buckley*, 509 U.S. at 273, even when that conduct is improper.

courts within this circuit, and in limited circumstances, on decisions of other circuits.'" *Moldowan*, 578 F.3d at 381-82 (quoting *Spurlock*, 167 F.3d at 1006). When evaluating whether the specific right has been recognized, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). "In other words, 'the unlawfulness must be apparent.'" *Moldowan*, 578 F.3d at 382 (quoting *Anderson*, 483 U.S. at 640).

Here, we can find no case law to support the conclusion that a reasonable official would have understood that the complained of action violated Koubriti's rights. Although Convertino's directive may be questioned, it cannot be said that its unlawfulness is apparent, particularly when reviewing the existing case law. While such behavior is in tension with the policy judgments underlying *Brady*,[16] it would indeed go well beyond the reasonable limits of the *Brady* non-disclosure doctrine to say that it also requires memorialization of interviews. Additionally, cases analyzing sets of facts more similar to the instant case than those in *Brady* have suggested that it is not a constitutional violation. *See Moore v. Illinois*, 408 U.S. 786, 795 (1972) ("We know of no constitutional requirement that the prosecution make a complete and detailed accounting to the defense of all police investigatory work on a case."); *United States v. Bernard*, 625 F.2d 854, 860 (9th Cir. 1980) ("Nor can we find a constitutional basis for compelling the creation of [written witness statements] under *Brady*.") Thus, Convertino's behavior, were it to be ruled as a constitutional violation, was not clearly established as a violation at the time Convertino acted. Convertino's qualified immunity, then, would still be sufficient to shield Convertino from this claim, even when characterized in the way the district court and Koubriti suggest.

---

[16]In *Brady*, the Supreme Court stated: "The principle . . . is not punishment of society for misdeeds of a prosecutor but avoidance of an unfair trial to the accused. Society wins not only when the guilty are convicted but when criminal trials are fair; our system of the administration of justice suffers when any accused is treated unfairly. . . . A prosecution that withholds evidence . . . of an accused which . . . would tend to exculpate him . . . does not comport with the standards of justice." *Brady*, 373 U.S. at 87.

**III.**

After it decided not to dismiss Koubriti's action on prosecutorial immunity grounds, the district court found that a *Bivens* action for money damages is "cognizable for a violation of an individual's Fifth Amendment due process rights." Because we rule today that the case must be dismissed because Convertino is shielded from these claims by prosecutorial immunity, we need not address the court's ruling on the applicability of *Bivens* relief to this context.

## CONCLUSION

For the foregoing reasons, we REVERSE the district court's decision to the extent it denied in part defendant Convertino's motion to dismiss and AFFIRM its decision to the extent it granted the motion to dismiss. The action is REMANDED for entry of a judgment of dismissal with respect to defendant Convertino.