NOT RECOMMENDED FOR PUBLICATION
File Name: 16a0257n.06

No. 15-2220

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**
May 11, 2016
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| JOHN C. BUCHANAN, JR., | ) | |
| | ) | ON APPEAL FROM THE |
| Plaintiff-Appellant, | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE EASTERN |
| v. | ) | DISTRICT OF MICHIGAN |
| | ) | |
| JAMES W. METZ II and DONOVAN MOTLEY, | ) | |
| | ) | **OPINION** |
| Defendants-Appellees. | ) | |

Before: SUTTON and GRIFFIN, Circuit Judges; and OLIVER, District Judge.[*]

OLIVER, District Judge. Plaintiff-Appellant, John C. Buchanan, Jr., brought this action against Defendants-Appellees James W. Metz II, an Assistant Attorney General for the State of Michigan, and Donovan Motley, a special agent with the Michigan Attorney General's Office, for malicious prosecution and false arrest under 42 U.S.C. § 1983 and Michigan law. The district court granted Metz's motion to dismiss Buchanan's First Amended Complaint, holding that Metz was entitled to absolute immunity on Buchanan's claims. Thereafter, the court granted Buchanan leave to file a Second Amended Complaint, allowing Buchanan to assert claims of false arrest under 42 U.S.C. § 1983 and Michigan law against Metz for actions allegedly conducted outside of his prosecutorial function that resulted in Buchanan's arrest. Subsequently, the court granted Motley and Metz's summary judgment motions with respect to all of Buchanan's claims. The district court concluded that Motley was entitled to qualified immunity

---

[*]The Honorable Solomon Oliver, Jr., Chief Judge, United States District Court for the Northern District of Ohio, sitting by designation.

on the federal malicious prosecution and false arrest claims and governmental immunity on the state malicious prosecution and false arrest claims. The district court also determined that Metz was entitled to absolute immunity on the federal false arrest claim and governmental immunity on the state false arrest claim. Buchanan argues on appeal that Motley and Metz are not entitled to immunity. For the following reasons, we **AFFIRM** the district court's dismissal of Buchanan's federal and state claims against Metz in his First Amended Complaint and **AFFIRM** the district court's grant of summary judgment to Motley and Metz on Buchanan's remaining federal and state claims.

## I. BACKGROUND

Buchanan filed this civil rights action against Motley and Metz, claiming that they falsely arrested him for attempting to defraud the State of Michigan of tax incentives for the film industry. This case arises from Buchanan's involvement with several other individuals in their efforts to redevelop a manufacturing plant into a film studio as part of Michigan's Film and Digital Media Tax Credit program.

In 2008, the Michigan State Legislature enacted a film infrastructure tax credit statute, which, at the time relevant to this case, permitted a taxpayer "to claim a tax credit equal to 25% of the taxpayer's base investment" for investing in "a qualified film and digital media infrastructure project" ("Tax Credit"). M.C.L. § 208.1457(1)-(2). The Michigan Film Office ("MFO"), with the concurrence of the State Treasurer, oversaw the issuance of the Tax Credit. M.C.L. § 208.1457(1).

### A. Factual History

Buchanan and his father formed Alpinist Endeavors, LLC ("Alpinist") to purchase a former plant known as Lear Plant or Hangar 42. Buchanan approached Joseph Peters, who

owned West Michigan Films, LLC ("WMF"), and they agreed that WMF would purchase two units of the Lear Plant for $40 million to take advantage of a $10 million Tax Credit. Buchanan's father did not have any input or knowledge about the specifics of this agreement when it was formed. In November 2009, WMF filed an application for the Tax Credit ("Application") with the MFO. The Application included a business plan, describing a state-of-the-art film production facility. The MFO also received a purchase agreement executed by Buchanan and Peters, demonstrating Alpinist's agreement to transfer two units of the Lear Plant to WMF. The purchase agreement contained a condition precedent that the buyer WMF would not be obligated to close the transaction unless it "obtained a commitment for [the Tax Credit] of no less than $10,000,000." R. 66-10, ID 1431, 1433. In November 2009, the MFO and the Treasurer preliminarily approved the Application. Ultimately, the Application was denied in May 2010.

Between the filing of the Application and the denial of the Application, Peters communicated frequently with Janet Lockwood, then Film Commissioner of the MFO, and Penny Launstein, an employee at the Michigan Economic Development Corporation ("MEDC"). The MEDC assisted the MFO in evaluating applications for the Tax Credit. Launstein and Lockwood sought final confirmation of WMF's purchase of the Lear Plant, details regarding the improvements to convert the Lear Plant into a film studio, the cost of these improvements, and other information. The MFO also repeatedly asked to conduct its own appraisal to determine whether the $40 million purchase price was reasonable and for invoices for the improvements to assist in conducting its own appraisal. Buchanan had access to these invoices but would not provide them to the MFO.

There were also a number of other individuals involved in the preparation and support of the Application. Buchanan recruited Brice Bossardet, who assisted with the business plan. Eventually though, Bossardet became increasingly uncomfortable with how the project was being financed and handled. He was concerned that Buchanan was ghostwriting statements for others to the MFO and taking a "loose or cavalier approach" to the Tax Credit procedure. R. 67-1, ID 1935; R. 67-12, ¶¶ 7-8. Buchanan and Bossardet had a falling out over this project and a different project. As a result, Bossardet stopped working on the Lear Plant project. Buchanan also recruited Noah Seifullah, a legislative aide to then-House Representative Robert Dean. Bossardet claimed that Seifullah was to be part owner of the film studio and paid a salary, but appear as an outside official lobbying for a project that would benefit Rep. Dean's constituency. Buchanan also sought the assistance of CPA Dennis Weiss with the project. Weiss sent a letter to the MFO and MEDC, representing that the qualifying infrastructure cost for the first phase of the project was $40 million, and that the cost complied with the Tax Credit requirements.

On February 2, 2010, Buchanan and his father entered into a "Redemption Agreement," where Buchanan's father would sell Alpinist and its ownership in the Lear Plant to Buchanan for $3.2 million. Payment of the purchase price to Buchanan's father was required in order to finalize the deal. On March 2, 2010, Peters submitted an Investment Expenditure Certificate ("IEC") form to Lockwood with various representations about the project's progress, along with a letter from Weiss stating that the WMF's purchase of the Lear Plant was complete and the infrastructure costs qualified the applicant for the $10 million Tax Credit.

On April 5, 2010, Buchanan and Peters executed a number of agreements purportedly closing the sale of the Lear Plant from Alpinist to WMF. In these documents, Peters assigned his interest in WMF to Seifullah, Seifullah appointed Peters as "authorized agent" for WMF, and

4

Peters (on behalf of WMF) executed a land contract with Buchanan (on behalf of Alpinist), granting the Lear Plant to WMF for $40 million. In his interview with Motley, Buchanan's father stated that he had not transferred the Lear Plant to Buchanan or approved any sale of the Lear Plant to WMF, and thus Buchanan had no authority to sell the Lear Plant to WMF. On May 23, 2010, the MFO denied the Application due to questions about the veracity of the $40 million purchase price, the accuracy of information contained in the Application, and the failure to provide requested documents.

On June 17, 2010, the Attorney General's Office began an investigation of Buchanan and Peters for potential fraud in their pursuit of the Tax Credit, which was assigned to Motley and Metz. On August 2, 2010, the Attorney General's Office announced that it was filing criminal charges against Peters for attempted fraud on the State. On October 27, 2010, Metz prepared an internal "Request to Initiate Litigation" memorandum for his supervisors in the Attorney General's Office, seeking one count of attempted false pretenses and one count of conspiracy against Buchanan. At least two of Metz's supervisors in the Attorney General's Office supported filing of the charges. Because of a change in administration in the Attorney General's Office from Attorney General Cox to Attorney General Schuette, approval was delayed, and Metz filed a largely identical second request on January 19, 2011, which was approved by a different supervisor in the Attorney General's Office.

On January 25, 2011, Motley appeared before a magistrate with an affidavit supporting his request for a warrant to arrest Buchanan, which cited three main bases for probable cause: (1) the Application was filed before Peters had any ownership interest in the Lear Plant, and falsely indicated that Peters had already purchased it; (2) Buchanan told Doug Adams, who appraised the Lear Plant, that the appraisal should be no less than $40 million, and hired Weiss to

send letters convincing the MFO that the Lear Plant had been sold to Peters; and (3) Buchanan signed a Memorandum indicating that he had sold the Lear Plant units to Peters, when Buchanan knew that, in fact, he did not have the authority to sell the units without his father's consent. The magistrate granted the request for the arrest warrant. Buchanan was booked and released on bond. After holding preliminary examinations in May, July and September of 2011, at which the state district court heard testimony, the state judge dismissed the charges against Buchanan and Peters for lack of probable cause. On December 17, 2012, Buchanan filed the instant suit, claiming that Motley's affidavit in support of the arrest warrant contained false statements and omissions, and that Defendants lacked probable cause to charge him. Thereafter, Buchanan amended his initial Complaint.

## B. Procedural History

On March 11, 2013, Metz filed a Motion to Dismiss Buchanan's First Amended Complaint, asserting that he was entitled to absolute immunity. The district court agreed, holding that Metz was entitled to absolute immunity regarding his prosecutorial functions, including his decision to initiate charges against Buchanan. The district court acknowledged that wrongful investigatory actions taken by Metz would not be protected by absolute immunity. However, the district court found that Buchanan failed to state any claim "to which absolute prosecutorial immunity does not apply[,]" since any investigative role taken by Metz only harmed Buchanan "as a result of his prosecution." R. 36, ID 686-87. Based on this analysis, the district court dismissed all of Buchanan's claims against Metz. Buchanan then filed a Motion to Reconsider and a Motion for Leave to File a Second Amended Complaint. The district court denied Buchanan's Motion to Reconsider and allowed Buchanan to file a Second Amended Complaint that asserted false arrest claims against Metz for actions he allegedly conducted

outside of his prosecutorial function, which resulted in Buchanan's arrest. These included allegations that Metz "falsely advised Motley that probable cause existed to arrest [Buchanan], or ordered his arrest in the absence of probable cause," and advised Motley on the investigation. R. 93, ID 4626-27.

Subsequently, Motley and Metz moved for summary judgment, asserting immunity on all of Buchanan's claims. The district court granted summary judgment, finding that Motley was entitled to qualified immunity on the federal malicious prosecution and false arrest claims and to governmental immunity on the state law malicious prosecution and false arrest claims. The district court also determined that Metz was entitled to absolute immunity, or, in the alternative, qualified immunity, on the federal false arrest claim, and was entitled to governmental immunity on the state law false arrest claim. Buchanan appealed.

## II. ANALYSIS

### A. Standards of Review

A district court's grant of a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim is reviewed *de novo*. *Benzon v. Morgan Stanley Distribs.*, 420 F.3d 598, 605 (6th Cir. 2005). Well-pled factual allegations in the complaint must be accepted as true and construed in the light most favorable to the plaintiff. *Id.*

Summary judgment is proper if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). We review *de novo* the district court's grant of summary judgment. *Wesley v. Campbell*, 779 F.3d 421, 434-35 (6th Cir. 2015). Furthermore, "[w]e do not weigh evidence, assess credibility of witnesses, or determine the truth of matters in dispute." *Halasah v. City of Kirtland*, 574 F. App'x 624, 629 (6th Cir. 2014) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)).

## B. Claims Against Motley

### 1. Federal Malicious Prosecution and False Arrest Claims

When the district court grants summary judgment on qualified immunity grounds, we determine whether—viewing the facts in the light most favorable to Buchanan—Motley's conduct (1) violated a statutory or constitutional right, which (2) is clearly established such that a reasonable officer would have known that the officer's conduct violated that right. *Harvey v. Carr*, 616 F. App'x 826, 827 (6th Cir. 2015) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)); *Martin v. City of Broadview Heights*, 712 F.3d 951, 957 (6th Cir. 2013). Qualified immunity is ordinarily a question of law for the court. *Hunter v. Bryant*, 502 U.S. 224, 228 (1991); *see also Thacker v. City of Columbus*, 328 F.3d 244, 259 (6th Cir. 2003).

Although the legal standards for claims of false arrest and malicious prosecution under the Fourth Amendment are different, both claims turn on the existence of probable cause. To prevail on a false arrest claim brought under 42 U.S.C. § 1983, "a plaintiff [must] prove that the arresting officer lacked probable cause to arrest the plaintiff." *Voyticky v. Village of Timberlake*, 412 F.3d 669, 677 (6th Cir. 2005). In other words, "probable cause provides a complete defense to a claim of false arrest." *Halasah*, 574 F. App'x at 629. When the arrest at issue is made pursuant to a warrant, "a plaintiff must prove (1) that the officer applying for the warrant, either knowingly and deliberately or with reckless disregard for the truth, made false statements or omissions that created a falsehood and (2) that such statements or omissions were material to the finding of probable cause." *Id.* If an affidavit contains a false statement or material omission, a court should set aside any false statement, or include any omission, in order to determine whether probable cause nonetheless exists, and an alleged misstatement or exaggeration of facts is insufficient to make a claim if other facts support the State's probable cause determination.

*Hill v. McIntyre*, 884 F.2d 271, 275 (6th Cir. 1989); *Burleigh v. City of Detroit*, 80 F. App'x 454, 458 (6th Cir. 2003).

To prevail on a malicious prosecution claim brought under 42 U.S.C. § 1983 and premised on a violation of the Fourth Amendment (assuming that such claims are cognizable, *see Manuel v. City of Joliet*, 136 S. Ct. 890 (2016)), a plaintiff is required to prove four things: (1) the defendant made, influenced, or participated in the decision to prosecute the plaintiff; (2) there was a lack of probable cause for the prosecution; (3) as a consequence of the prosecution, the plaintiff suffered a deprivation of liberty, apart from the initial seizure; and (4) the criminal proceeding was resolved in the plaintiff's favor. *Halasah*, 574 F. App'x at 631. The definition of probable cause is "reasonable grounds for belief, supported by less than prima facie proof but more than mere suspicion." *Id.* at 629. The key inquiry here is whether a reasonable officer in Motley's position "would have known that his affidavit [in support of the arrest warrant] failed to establish probable cause and that he should not have applied for the warrant." *Legenzoff v. Steckel*, 564 F. App'x 136, 149 (6th Cir. 2014); *see also Stahl v. Czernik*, 496 F. App'x 621, 624 (6th Cir. 2012); *Halasah*, 574 F. App'x at 630 ("knowledge of the precise crime committed is not necessary to a finding of probable cause provided that probable cause exists" showing that the defendant was committing a crime).

### a.  Elements of the Crime

Buchanan argues that, taking the facts in the light most favorable to Buchanan, "Defendants could not have reasonably thought there was probable cause to arrest for attempted fraud by false pretenses," because there was no evidence of the intent to defraud and false pretenses elements of the crime. Appellant's Br. at 26-31. He maintains that any evidence supported only a generalized suspicion, not probable cause. We disagree.

The Michigan Supreme Court has stated, "[t]o defraud is to deprive another of a right, of property or of money, and this may be accomplished by falsehood, by withholding the right or property, or by force." *People v Getchell*, 6 Mich. 496, 504-505 (1859); *see also People v. McCoy*, 254 N.W.2d 829, 834 (Mich. Ct. App. 1977). At the time of Buchanan's arrest, "false pretense" included "a false or fraudulent representation," which may be "regarding a past or existing fact or . . . regarding the intention to perform a future event or to have a future event performed[,]" "communicated by any means to another person, that the maker of the representation . . . knows is false or fraudulent." Mich. Comp. Laws § 750.218(9) (West 2011). Buchanan does not challenge any other elements.

Buchanan admits that he and Peters formulated the plan to sell the Lear Plant to WMF in order to obtain and use the Tax Credit. There is no dispute that Peters submitted the IEC form to Lockwood on March 2, 2010, along with a letter from Weiss, representing that WMF had purchased the qualifying facility, Lear Plant, as a complete "turnkey" digital media and film studio from Alpinist. This was not a true statement. Lockwood did subsequently learn from Peters that WMF had not purchased Lear Plant as represented in Weiss's letter, but she and Launstein found this information concerning and possibly illegal.

Furthermore, Peters represented to Lockwood that he had "no interest whatsoever [in] allow[ing] Buchanan access to details" and that Buchanan was "a pushy demanding Seller," which were clearly false and misleading representations of his relationship with Buchanan. R. 82-6, ID 3259. Buchanan was a driving force behind the plan, and the record indicates that the individuals involved in this plan tried to portray an arms-length transaction to the MFO to obtain the Tax Credit. Additionally, it is undisputed that Bossardet told Motley during Motley's pre-arrest investigation that Buchanan threatened him in order to prevent him from calling Launstein

10

or leaking information Bossardet believed was misleading to obtain the Tax Credit. Further, Bossardet provided Motley with a documented example of a potential threat. While Buchanan argues that Bossardet had a vendetta against Buchanan and thus he should not be believed, this does not negate the fact that the information he provided to Motley could lead a reasonable officer to conclude that a crime was afoot.

Moreover, Motley averred that in one of his interviews with Douglas Adams, who conducted the 2010 appraisal of the Lear Plant, Adams relayed a discussion he had with Buchanan with respect to the $40 million land contract regarding the Lear Plant. Adams indicated he relied on this discussion, in part, to appraise the Lear Plant, and that Buchanan told him that the 2010 appraisal should be for no less than $40 million. Adams did testify a few years later in a deposition that he could not recall the conversation with Motley well enough to determine whether Motley's affidavit was accurate, but that Motley's averments were possible. Adams also testified that Buchanan did tell him about the $40 million land contract with WMF and that the amount did have an effect on his assumption about sufficient demand for the Lear Plant. Furthermore, based on a statement Weiss made to Metz during an interview at which Motley was present, and email exchanges between Weiss and Buchanan, there was sufficient information to support a conclusion that Buchanan sought to influence the audit Weiss provided to the State through offering ownership interest in the project to Weiss. A reasonable officer reviewing the evidence Motley had leading up to the request for an arrest warrant could conclude that Buchanan sought to influence the $40 million valuations. Adams's testimony does not negate this evidence or change this conclusion.

Buchanan's interactions with Adams and Weiss suggested that Buchanan sought to mislead the State about the value of the property in order to receive an inflated Tax Credit from

the State, thereby defrauding Michigan's taxpayers in the process. Thus, a reasonable officer could have concluded that there was probable cause that Buchanan's actions satisfied every element of Michigan's attempted false pretenses crime, including the intent to defraud.

We are not persuaded by Buchanan's contention that this case required a jury determination. The question at issue here is whether, in analyzing that evidence, no reasonable officer would believe that a crime was being committed. Examining the totality of the evidence that was before Motley prior to his request for an arrest warrant, we find that it is not clearly established that a reasonable officer in Motley's position would believe that his affidavit in support of the arrest warrant was insufficient to establish probable cause.

### b. Exculpatory Evidence

Buchanan argues that Motley violated the Fourth and Fifth Amendments by deliberately ignoring exculpatory evidence. Buchanan asserts that Motley failed to inform his superiors that "everyone believed" the Lear Plant's converted film studio would operate as promised upon payment of the Tax Credit, and that there were emails demonstrating that Lockwood knew the sale was not completed. Appellant's Br. at 52. Buchanan also maintains that Motley failed to disclose that Buchanan's father authorized the sale of the Lear Plant to WMF, despite his subsequent statements to Motley refuting this contention, and that testimony varied regarding the potentially inflated appraisal of the Lear Plant.

A determination of probable cause "is based on the 'totality of the circumstances,' and must take account of 'both the inculpatory *and* exculpatory evidence.'" *Wesley v. Campbell*, 779 F.3d 421, 429 (6th Cir. 2015) (quoting *Gardenhire v. Schubert*, 205 F.3d 303, 318 (6th Cir. 2000)). Here, after examining the totality of the evidence, both harmful and helpful to Buchanan, as described above, we found that it was not clearly established that no reasonable

officer would have concluded that a crime had been committed. Although Buchanan overreaches in his description of the allegedly exculpatory evidence, there was certainly information favorable to Buchanan, which raises questions as to the strength of the case against him. However, even considering this evidence in the light most favorable to Buchanan, we cannot say that it is clearly established that no reasonable officer would believe that a crime was being committed. Thus, we need not address the prong of whether there was a violation of Buchanan's constitutional rights.

### 2. State Law Malicious Prosecution and False Arrest Claims

Governmental immunity from liability for intentional torts is granted under Michigan state law where a governmental employee:

> establish[es] that (1) the employee's challenged acts were undertaken during the course of employment and that the employee was acting, or reasonably believed he was acting, within the scope of his authority, (2) the acts were undertaken in good faith, and (3) the acts were discretionary, rather than ministerial, in nature.

*Odom v. Wayne Cty.*, 760 N.W.2d 217, 218 (Mich. 2008); *see also Binay v. Bettendorf*, 601 F.3d 640, 653 (6th Cir. 2010) (citing *Odom*).

Here, Buchanan does not argue that the district court erred in its conclusion that Motley was entitled to governmental immunity with respect to Buchanan's state law claims. Buchanan also does not directly challenge the district court's conclusion that there is no evidence Motley acted with malicious intent or in bad faith. Instead, Buchanan argues that Motley violated the Fourth and Fifth Amendments by "deliberately ignoring exculpatory evidence" and "falsifying the picture to charging authorities." Appellant's Br. at 51-53. The allegedly exculpatory evidence included that "everyone believed" the film studio would operate as promised upon payment of the Tax Credit, that Lockwood knew the sale was not completed, that Buchanan's

father authorized the sale of the Lear Plant to WMF, and that testimony varied regarding the potentially inflated appraisal of the Lear Plant.

Since governmental immunity only applies to state law claims, not allegations of violation of federal constitutional law, Buchanan has not properly raised this issue on appeal. Furthermore, even if we construe Buchanan's argument as challenging the district court's finding of governmental immunity, while the evidence Buchanan points out does raise questions about the strength of the case against him, we do not find that Motley's failure to inform his superiors of the listed omissions constitutes conduct undertaken without good faith.

### C.  Claims Against Metz

### 1.  Federal False Arrest Claim

Prosecutors generally "enjoy absolute immunity from civil liability for actions performed within the scope of their prosecutorial duties." *Huffer v. Bogen*, 503 F. App'x 455, 459-60 (6th Cir. 2012); *see also Drake v. Howland*, 463 F. App'x 523, 525 (6th Cir. 2012) (citing *Imbler v. Pachtman*, 424 U.S. 409, 427-28 (1976)).  The question of whether "absolute immunity protects a defendant from liability under 42 U.S.C. § 1983 is a legal question" reviewed *de novo*.  *Cady v. Arenac Cty.*, 574 F.3d 334, 339 (6th Cir. 2009).

The Supreme Court uses a "functional approach" for determining when a prosecutor "is acting within the scope of his duties as a prosecutor and when he is merely giving legal advice or investigating." *Howell v. Sanders*, 668 F.3d 344, 349 (6th Cir. 2012) (citing *Burns v. Reed*, 500 U.S. 478, 486 (1991)).  The key inquiry is "how closely related . . . the prosecutor's challenged activity [is] to his role as an advocate intimately associated with the judicial phase of the criminal process."  *Id.* at 349-50 (quoting *Ireland v. Tunis*, 113 F.3d 1435, 1443 (6th Cir. 1997)).  The prosecutor's "decision to file a criminal complaint and seek issuance of an arrest warrant are

quasi-judicial duties involved in 'initiating a prosecution'" and are protected. *Ireland*, 113 F.3d at 1446 (quoting *Joseph v. Patterson*, 795 F.2d 549, 555-56 (6th Cir. 1986)). Furthermore, "[p]rosecutorial immunity extends to claims regarding the evaluation of evidence and the determination of probable cause." *Huffer*, 503 F. App'x at 460.

Based on the governing law, Metz is entitled to absolute immunity for any prosecutorial functions. Buchanan argues that Metz's Requests to Initiate Litigation did not serve such a function, because Metz had to seek approval to prosecute Buchanan from his superiors and his Requests were only presentations of fact rather than legal analysis. Buchanan contends that the Requests were investigatory functions, not advocacy functions protected by absolute immunity.

Prosecutors acting within the scope of their duties in initiating and pursuing criminal prosecutions are entitled to absolute immunity. *Spurlock v. Thompson*, 330 F.3d 791, 796-97 (6th Cir. 2003) (citing *Imbler*, 424 U.S. at 430); *see also Schenk v. Chavis*, 461 F.3d 1043, 1046 (8th Cir. 2006) ("'[A]ctions connected with initiation of prosecution, even if those actions are patently improper' are immunized"); *cf. Wilson v. Kinneary*, 740 F.2d 970 (6th Cir. 1984) (unpublished) ("clerks have absolute immunity from actions for damages arising from acts which they must perform under court order or at a judge's direction"). Here, Metz was acting within the scope of his duty when he initiated and pursued criminal prosecution against Buchanan through his Requests to Initiate Litigation. The fact that Metz's Requests had only a "Facts" heading, and no "Law" heading, is of no consequence. Metz's acts of evaluating the evidence and drafting requests to trigger a criminal prosecution against Buchanan are immunized. Thus, the district judge properly dismissed the claims in Buchanan's First Amended Complaint that relate to evaluation of evidence and initiation of criminal prosecution.

The district judge also correctly concluded that Metz would not be entitled to absolute immunity for his investigative acts that violated Buchanan's rights, such as falsifying evidence. However, Buchanan failed to present any evidence to support a finding that Metz's investigatory actions were unlawful. Buchanan maintains that a jury should have made this determination. He argues that there was circumstantial evidence for a jury to decide whether Metz falsely advised or instructed Motley that he had probable cause, and whether Metz helped Motley prepare a false affidavit for an arrest warrant. Buchanan contends that the following circumstantial evidence supports this argument: (1) Motley testified that the lawyers made determinations of who to charge with a crime, (2) Metz's summary of the case was found in Motley's file, and (3) Motley's presentation to the magistrate tracked the theories narrowed down by the attorneys. This argument is grounded in speculation.

Buchanan points to no documents or testimony specifically tying Metz to any false advice or unlawful instructions from which a jury could make any determinations as to a genuine issue of material fact. Buchanan may point to Motley's testimony that the lawyers made the determination as to "who to charge and who not to charge," R. 83-13, ID 3465, but Motley never testified that *Metz* instructed him to arrest Buchanan without soliciting his opinion, such as in *Harris v. Bornhorst*, 513 F.3d 503, 510-11 (6th Cir. 2008). Buchanan instead relies on speculation, such as "[i]t is far more likely" that Motley structured his presentation based on a review of Metz's summary or in discussions with Metz. Appellant's Br. at 55. But Buchanan describes no specific facts as to the content of any false advice or instruction that Metz gave Motley. Thus, this mere speculation as to Metz's alleged role in advising Motley is insufficient to survive summary judgment. Furthermore, any role that Metz may have had in advising

Motley would be protected under qualified immunity, since we found that it is not clearly established that no reasonable officer would believe that a crime was being committed.

Additionally, insofar as Buchanan characterizes Metz's failure to disclose exculpatory evidence as an investigatory rather than prosecutorial act, the district court correctly rejected this claim. When the "claim (and underlying harm) is only related to the non-disclosure [of facts] and not [any violation in] the underlying investigation," such as falsifying evidence, the failure to disclose is not investigatory but prosecutorial in function and remains within the ambit of absolute immunity. *See Koubriti v. Convertino*, 593 F.3d 459, 469 (6th Cir. 2010). Because "prosecutors are almost always involved with the police's investigation of crimes," *id.*, the claimant would need only to reframe every claim "to attack the preparation instead of the absolutely immune actions themselves." *Bianchi v. McQueen*, 917 F. Supp. 2d 822, 831 (N.D. Ill. 2013) (quoting *Rehberg v. Paulk*, 132 S. Ct. 1497, 1506 (2012)). This is not the law; more is required. *Id.*; *Koubriti*, 593 F.3d at 469. Thus, the district judge properly concluded that Buchanan cannot "seek[] respite from absolute immunity" merely because Metz "participated in an investigation before [Buchanan's] arrest," when Buchanan's claimed injury arises solely from the fact of the prosecution, rather than an adequately alleged violation committed in the underlying investigation. R. 36, ID 686-87. Furthermore, as discussed above with Motley, even if absolute immunity does not apply to Metz's failure to disclose this evidence, qualified immunity applies. Thus, the district court properly dismissed Buchanan's federal false arrest claims against Metz.

### 2. State Law False Arrest Claim

Metz is entitled to governmental immunity on Buchanan's state law false arrest claim for the same reasons as Motley.

### III. CONCLUSION

For the above reasons, we **AFFIRM** the district court's grant of absolute immunity to Metz on Buchanan's federal and state claims in the First Amended Complaint, and **AFFIRM** the district court's grant of summary judgment to Motley and Metz on the federal and state claims in Buchanan's Second Amended Complaint.