NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 12a0952n.06

No. 11-2266

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**

***Aug 27, 2012***

LEONARD GREEN, Clerk

JOHN STAHL,

    Plaintiff-Appellee,

v.

SARGENT PHIL CZERNIK,

    Defendant-Appellant,

CATHERINE O'MEARA

    Defendant.

)
)
)
)
)
)
)
)
)
)
)
)
)
)

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF MICHIGAN

---

BEFORE: ROGERS and KETHLEDGE, Circuit Judges, and MARBLEY, District Judge.[*]

ROGERS, Circuit Judge. In this §1983 action, plaintiff John Stahl alleges that he was wrongfully incarcerated for a crime he did not commit. Stahl was arrested in connection with a series of home invasions in Michigan. Three witnesses had observed the crimes, two of which identified Stahl as the perpetrator. Defendant Czernik led the investigation but omitted certain facts when completing an arrest warrant application. The police arrested Stahl, but released him four months later after another individual confessed to the crimes. Stahl sued and the district court denied Czernik's request for qualified immunity. Qualified immunity was warranted, however, because there was probable cause to arrest Stahl even in light of the omitted information.

---

[*]The Honorable Algenon L. Marbley, United States District Judge for the Southern District of Ohio, sitting by designation.

At the time of the home invasions, Stahl was living in Romulus, Michigan. As a consequence of a lengthy period of unemployment, Stahl had started going door-to-door and offering to perform odd jobs for his neighbors. On one occasion, he mowed the lawn of Carol Daly, whose home was one block south of Stahl's home. Stahl is white and has tattoos, but no tattoos on his legs.

In July 2008, Ernest Brown—Daly's neighbor—observed a man walking from house-to-house, ringing doorbells, and looking through windows. After knocking on Daly's door, the man opened a gate and walked into her backyard. Brown contacted another neighbor, Diane Swantek, and asked her if she recognized the man in Daly's yard. Brown and Swantek called police after witnessing the man leave Daly's home with a jar of money.

When a Romulus police officer arrived, Brown described the suspect as a white male who was approximately six feet tall, and who had a tattoo of a dragon on his leg. Swantek believed the man was between 5'8" and 5'10", had a muscular-slim build, and had a large tattoo on his left calf. These descriptions were recorded in a police narrative report. The responding officer also contacted Daly, who said that Stahl matched the description provided by Brown and Swantek. Daly explained that Stahl had been going door-to-door soliciting landscaping work and had once cut her grass.

A few days later in the same neighborhood, a man with blond hair knocked on Jacqueline Culiver's door. Culiver answered the door and stood face-to-face with the suspect. The man seemed surprised that Culiver was home, stated that he had the wrong house, and ran away down the street. There was some evidence that the man had tampered with a screen on Culiver's door or window.

Culiver called the police and recounted the incident to an officer that responded to the scene. Culiver described the suspect as a tall white man who had tattoos on his arms. During this conversation, Culiver saw Stahl's photograph on a computer screen in the officer's vehicle. Culiver identified Stahl as the man who had knocked on her door. An officer who was sitting in the vehicle told Culiver that the man pictured was a suspect in earlier break-ins. The police recorded Culiver's description of the suspect in a police narrative, but did not mention her spontaneous identification.

Czernik, the detective assigned to the case, received the files regarding the two incidents and was told that Stahl was a suspect. In the course of his investigation, Czernik showed a photo array to Brown, Swantek, and Culiver. Brown and Culiver identified Stahl, but Swantek did not. Brown testified in his deposition that, at the time of the identification, he had told the officers that he would have been certain of the suspect's identity if he knew whether Stahl had a tattoo on his leg.

Following these witness identifications, Czernik wrote an investigative report, but omitted certain facts. The report did not mention that the suspect had a leg tattoo, describe the circumstances surrounding Brown's identification of Stahl, or state that Swantek had failed to identify Stahl. The report also failed to note that Culiver had spontaneously identified Stahl and that the police told Culiver that Stahl was a suspect in other break-ins. Czernik included this report in an application for a warrant to arrest Stahl. Barbara Smith, a prosecutor, issued the warrant after reviewing the investigation report, the police narrative reports, and the photo arrays.

Stahl, who had been arrested in Las Vegas on an unrelated charge, was transferred to Michigan. On the advice of counsel, Stahl waived his preliminary examination and his right to

contest probable cause. Stahl was released from Wayne County Jail on February 9, 2009—more than six months after his initial arrest—after another individual confessed to the crimes.

Stahl sued Czernik and others under 42 U.S.C. § 1983, asserting a claim of false arrest and false imprisonment. Czernik filed a motion seeking qualified immunity, which the district court denied. *Stahl v. Czernik*, No. 09-14266, 2011 WL 4502862, at *8 (E.D. Mich. Sept. 28, 2011). The district court divided its analysis into two steps: (1) whether there was a constitutional violation and (2) whether the right was clearly established. The district court held that a constitutional violation occurred when Czernik failed to mention the problems with the eyewitness identifications in the warrant application: Brown's identification was qualified, Culiver previewed Stahl's photograph, and Swantek did not identify Stahl. Moreover, the court held that Czernik should have consulted Romulus Police Department records, which contained a description of Stahl at odds with the witness descriptions. The court noted that such a discrepancy should have been included in the warrant application. The district court also held that it was clearly established that an arrest made without probable cause is unconstitutional. Czernik filed this interlocutory appeal.

The district court should have granted Czernik's motion for qualified immunity because probable cause supported Stahl's arrest and the information Czernik omitted from the warrant application was not material. An official is entitled to qualified immunity when he is performing a discretionary duty, provided that his "conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). To evaluate whether qualified immunity applies this court evaluates whether

the official violated a constitutional right and whether the impacted right is "clearly established." *See Pearson v. Callahan*, 555 U.S. 223, 236 (2009). The order of this inquiry is not mandatory, nor does a court need to reach both steps. *Id.*

Czernik did not commit a constitutional violation because he had probable cause to arrest Stahl. An arrest pursuant to a facially valid warrant is normally a complete defense to a false arrest claim. *See Baker v. McCollan*, 443 U.S. 137, 143–44 (1979). Therefore, a plaintiff such as Stahl must show that the officer recklessly or intentionally "omitted information . . . provided that the information . . . is critical to the finding of probable cause." *Voyticky v. Vill. of Timberlake*, 412 F.3d 669, 677 n.4 (6th Cir. 2005). Stahl contends that Czernik recklessly omitted four material facts from the warrant application: (1) that Brown qualified his identification of Stahl; (2) that Culiver had previewed Stahl's photo prior to the photo lineup; (3) that discrepancies existed between the witness descriptions and Romulus police records; and (4) that Swantek did not identify Stahl as the perpetrator. The central inquiry is whether there would have been sufficient probable cause had the warrant application included this omitted information. *Sykes v. Anderson*, 625 F.3d 294, 305 (6th Cir. 2010) (citing *Hill v. McIntyre*, 884 F.2d 271, 275 (6th Cir. 1989)).

Probable cause supported Stahl's arrest even if the warrant application had included the omissions. Probable cause exists if the "facts and circumstances within the officer's knowledge [] are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing or is about to commit an offense." *Crockett v. Cumberland Coll.*, 316 F.3d 571, 580 (6th Cir. 2003). In the qualified

immunity context, the court evaluates whether "a reasonable officer could have believed [the arrest] to be lawful." *Hunter v. Bryant*, 502 U.S. 224, 227 (1991) (internal quotation marks omitted). In general, an eyewitness identification provides sufficient probable cause to arrest a defendant, "unless, at the time of the arrest, there is an apparent reason for the officer to believe that the eyewitness was lying, did not accurately describe what he had seen, or was in some fashion mistaken." *Ahlers v. Schebil*, 188 F.3d 365, 370 (6th Cir. 1999) (internal quotation marks omitted). "This comports with the general notion that, since eyewitnesses' statements are based on firsthand observations, they are generally entitled to a presumption of reliability and veracity." *Id.*

In Stahl's case, two eyewitnesses—Brown and Culiver—identified Stahl as the perpetrator of the burglaries. These identifications provided sufficient evidence to establish probable cause to support the arrest warrant. A reasonable officer would have found the identifications to be reliable because there is no allegation that the witnesses lied, misremembered, or made a readily apparent mistake evident at the time of the identification.

We are not persuaded that the omitted information eliminated the probable cause established by the two witnesses. Stahl contends that the arrest warrant application should have mentioned that Brown would have been more certain of the identification if he could see the suspect's tattoos. Even had this information been included, however, probable cause still would have existed. Admittedly, the qualification diminishes the evidentiary weight of Brown's identification, but it does not vitiate the identification completely. Brown still positively identified Stahl as the perpetrator of the crime, while indicating that he would be more certain of his answer if he saw the tattoo. Further, Brown's

identification of Stahl did not occur in a vacuum. While Brown hedged his identification, Culiver did not. According to her testimony, she had come face-to-face with the perpetrator, and affirmatively identified Stahl. Viewing Brown's and Culiver's identifications in tandem, a reasonable officer could have believed that Stahl committed the offenses in question.

We find similarly unpersuasive Stahl's contention that probable cause did not exist because Culiver saw Stahl's picture before participating in the photo lineup. At the scene of the second burglary, Culiver saw Stahl's picture in the police cruiser without any direction or suggestion from the police, and spontaneously identified Stahl as the perpetrator. In *Mock v. Rose*, 472 F.2d 619, 621 (6th Cir. 1972), this court held that an "accidental and unplanned" confrontation between a witness and suspect that led to a "spontaneous" identification did not taint a future identification at trial. In Stahl's case, there is no question that Culiver accidentally saw the photograph, and that Culiver spontaneously identified Stahl as the perpetrator of the crime. Although the photograph was on a screen in a police cruiser, the officers gave no indication that Stahl was a suspect prior to Culiver's identification. Although the officers indicated that Stahl was suspected of other burglaries, these comments would not have tainted the photo lineup. Culiver had already identified Stahl, and a reasonably prudent person could believe that her subsequent identification was unconnected with the police comments.

Moreover, Stahl arguably benefitted from the omission of Culiver's initial identification from the warrant application. A witness may view a suspect alone at a time near to the crime:

> There is no prohibition against a viewing of a suspect alone in what is called a "one-man showup" when this occurs near the time of the alleged criminal act; such

a course does not tend to bring about misidentification but rather tends under some circumstances to insure accuracy.

*Mock*, 472 F.2d at 621 (quoting *Bates v. United States*, 405 F.2d 1104, 1106 (D.C. Cir. 1968)). Culiver saw the photograph of Stahl in isolation, but immediately after the crime occurred. Her identification, therefore, would have been valid under the rule articulated in *Mock*, and would have made it *more* probable that Stahl had committed the crime. Accordingly, Stahl was not prejudiced by, but perhaps even benefitted from, the omission.

We likewise reject Stahl's contention that probable cause would not have existed if the warrant application had mentioned Swantek's failure to identify Stahl. Had this failure to identify occurred absent any other evidence, Stahl might have a valid argument. However, two other witnesses identified Stahl as the perpetrator; therefore, Swantek's failure to identify Stahl carried little evidentiary weight. There are many reasons Swantek may not have been able to identify the perpetrator—bad eyesight, bad angle, or the fact that Stahl did not commit the crime. When viewed in light of the two other positive identifications, however, a prudent person would have concluded that Swantek's inability to identify Stahl was caused by a factor other than Stahl's innocence.

Stahl argues that had Czernik investigated Romulus police records, he would have found discrepancies between the description in the records and those of the eyewitnesses. Romulus Police records, generated in connection with an earlier arrest for DUI, indicated that Stahl was four inches shorter than the perpetrator described by witnesses. R. 35-8, Czernik Dep. at 56-58. Further, the records indicate that Stahl did not have a leg tattoo. *Id.* Had Czernik included these discrepancies in his arrest warrant application, Stahl contends, the warrant would not have issued.

Stahl's argument rests on shaky ground because Czernik had no continuing duty to investigate. As this court said in *Ahlers*, "[o]nce probable cause is established, an officer is under no duty to investigate further or to look for additional evidence which may exculpate the accused." 188 F.3d at 371. The *Ahlers* panel addressed an argument similar to Stahl's argument, and explained that "officers, in the *process of determining whether probable cause exists*, cannot simply turn a blind eye toward potentially exculpatory evidence known to them in an effort to pin a crime on someone." *Id.* at 372 (emphasis in original). The *Ahlers* panel distinguished the case before it because, like the circumstances in Stahl's case, the officers had completed the process of determining whether probable cause existed and the potential exculpatory evidence was not known to them. We explained:

> In the instant matter, the officers undeniably had sufficient probable cause to sustain [plaintiff]'s arrest with [victim]'s allegations, and Plaintiffs now wish to hold them liable for evidence which they failed to collect and, therefore, of which they were unaware. In this respect, then, the instant case is more analogous to that in *Crisp v. City of Kenton*, No. 97-3192, 1998 WL 180561 (6th Cir. 1998) (unpublished table decision), where a panel concluded that a challenged arrest was supported by probable cause. Crisp, the plaintiff in that case, argued that the officers did not have probable cause to arrest him because there was information which, if the officers had considered it, would have established that there was no probable cause to suspect Crisp of criminal activity. *Id.* at *4. The panel, however, rejected Crisp's argument, reasoning that "on the basis of the information the officers actually had, as opposed to information they could have had if they had looked at Crisp's identification and believed his story, the officers certainly had sufficient information" with which to establish probable cause. *Id.* Likewise, this panel concludes that on the basis of the information known to them, i.e., [victim]'s statement and the window of opportunity, these Defendants established sufficient probable cause to sustain [plaintiff]'s arrest. Although [defendant]'s investigation certainly was no model of thoroughness and left many reasonable sources of evidence unexplored, on the basis of the facts before us, we find that the district court properly concluded that there were no genuine issues

of material fact as to whether Defendants had sufficient probable cause to sustain [plaintiff]'s arrest.

*Id.* In Stahl's case, as discussed above, Czernik had probable cause to suspect Stahl was the perpetrator of the robberies. Once this probable cause was established, Czernik had no duty to sift through records of the Romulus Police Department for potentially exculpatory evidence before applying for a warrant. Such a requirement, if generally imposed, would waste valuable time and resources, and impede the police's ability to make a timely arrest. Although some officers might have conducted a more thorough investigation, this failure to find information not known to Czernik cannot be the basis of a false arrest claim.

Even if the court were to consider the two discrepancies—the height and tattoo—probable cause would have still existed because two witnesses identified Stahl as the culprit. In a similar case, the Second Circuit found probable cause existed to arrest a suspect who was shorter, and of a different skin tone, than the person described in the arrest warrant. *Martinez v. City of New York*, 340 F. App'x 700, 701 (2d Cir. 2009). The *Martinez* court determined that because the suspect and the target of the warrant had the same name and birth date, the differences were "too minor to preclude a finding of probable cause." *Id.* (internal quotation marks omitted). Here, two witnesses identified Stahl as the perpetrator, making the difference between the height in the police report and the witness description too minor to preclude a finding of probable cause. Moreover, unlike in *Martinez*, the height discrepancies were in a police report and not on the face of the warrant itself. Turning to the tattoos, the fact that the police records indicate that Stahl did not have tattoos as the time of his DUI arrest did not entirely preclude his being the culprit. Stahl could have been released

from custody following his prior arrest, and that very day driven to the tattoo parlor. Had the reverse been true—the report indicating a tattoo and the witnesses indicating no tattoo—the result might have been different.

Stahl contends that the omissions are nonetheless material because the prosecutor who signed the arrest warrant testified to their materiality. This argument asks us to apply the wrong standard of review. "Smith stated that some of the reasons for denying a request for a warrant would be '[i]f someone is not sure of an identification' or 'there are inconsistent stories that are being given.'" *Stahl*, 2011 WL 4502862, at *6. Smith also testified that it is material if someone had previewed a photograph before a photograph lineup, that if an identification mentioned tattoos it would be material if the suspect had no tattoos, and that a non-identification of a suspect is relevant. *Id.* at *6-8. While the district court reasoned that "a reasonable jury could find that Smith would not have issued an arrest warrant if this information had not been omitted by Czernik," *id.* at *8, this is not the standard. "Where qualified immunity is asserted, the issue of probable cause is one for the court since the entitlement is immunity from suit rather than a mere defense to liability." *Vakilian v. Shaw*, 335 F.3d 509, 517 (6th Cir. 2003) (internal quotation marks omitted). In making this determination, the court employs an objective test that is not governed by the subjective beliefs of one prosecutor. This flows from the general rule articulated by the Supreme Court that "Defendants will not be immune if, on an objective basis, it is obvious that no reasonably competent officer would have concluded that a warrant should issue; but if officers of reasonable competence could disagree on this issue, immunity should be recognized." *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

- 11 -

Further, Stahl misapprehends Smith's testimony. When asked a series of hypothetical questions, Smith answered that the information in the hypothetical may have been relevant. However, Smith was not presented with the entire context of those facts. Further, she never said that probable cause would not have existed had those facts been included in the warrant application. With regard to the qualification Brown made about his identification, Smith testified:

Q: From reading that report, does that—would that have convinced you that Ernest Brown had positively ID'd John Stahl as the perpetrator of the crime?

A: I wouldn't have charged if I didn't think that.

Q: Okay. At anywhere in that incident report, are you aware if Detective Czernik disclosed the comment by Ernest Brown, stating that John Stahl may be the guy but he would have to look at his legs to see the tattoos to see if it was the guy. Was there any disclosure of that fact?

* * *

Q: Again, does that document [referring to Czernik's report to Smith] indicate that Mr. Brown limited his identification to saying, "It may be him but I would need to see his—the tattoos on his legs."

A: No, I didn't see that in there.

* * *

Q: All right. Did Detective Czernik ever inform your office that they do not have any records with John Stahl having tattoos on his legs?

A: Our office. Do you mean me personally?

Q: You personally, yes.

A: I don't have any recollection of that.

Q: Okay. Would that be something that would be important; to figure out if this is the right individual? . . . If, in making your determination of for probable cause, would you want to know whether the person matches the identification or the description?

- 12 -

> A: Well, yes.
>
>                 * * *
>
> Q: If an officer wrote down that a person positively identified someone without also disclosing a "maybe" or a qualifier that, "I need to see additional information to make a decision," is that something you would expect to be in the police report?
>
> A: Yes, I would hope it would be.
>
> Q: Is that also something that could affect your decision as to whether to recommend a warrant?
>
>                 * * *
>
> A: Yes.

*Stahl*, 2011 WL 4502862, at *6–7. Although Smith might like to know if a witness had qualified an identification of a suspect, she never said it would have been material. She said that a qualification could hypothetically be important, but never said it would have affected her decision in this instance. Assessing the totality of the circumstances, as discussed above, Brown's qualification would not have eliminated probable cause.

Stahl similarly stretches Smith's testimony about the alleged taint on Culiver's identification. Smith testified:

> Q: Okay. With respect to Jacqueline Culver—Culiver, do any of these documents [referring to those presented to Smith by Czernik] indicate that . . . Jacqueline Culiver was shown a picture of John Stahl prior to the photographic line-up?
>
> A: No.
>
> Q: Are you aware that that occurred—or at least that's what she testified occurred?
>
>                 * * *
>
> A: No, other than you telling me that—

* * *

Q:     I want you to assume for the purposes of the question that Jacqueline Culiver saw a picture of John Stahl on a computer screen inside a police car. Okay? And then the next day, Detective Czernik came out and did a photographic line-up with her where she positively ID'd John Stahl as the perpetrator of the crime. Would have that affected the legitimacy of the photographic line-up, in your opinion?

* * *

Of her identification in the line-up?

* * *

A:     It would be a factor that you would want to know in considering that a line-up was held subsequently; that's one of the factors you consider.

Q:     Were you ever informed that—of that event, of her seeing a photo—photo of John Stahl?

A:     No.

* * *

Q:     What about where [a witness is] shown a photograph of the person or they see a photograph of the person; would that be something that should be in an incident report?

* * *

A:     In an ideal world, yes, I would think it should have be in there.

Q:     Well, how about just in the world we have; is that something you would expect to be in there?

A:     Yes.

*Id.* at *8. This entire line of questions implied that somehow the lineup was tainted by Culiver's spontaneous identification of Stahl as the perpetrator. As discussed above, this is not true, and therefore does not cut against our analysis. Because Czernik did not violate a constitutional right, we need not decide whether a right was clearly established. *Cf. Pearson*, 555 U.S. at 236.

The district court's judgment is reversed.