NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 17a0017n.06

Case No. 15-4125

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**
Jan 09, 2017
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| JOHN HARMON; STEPHANIE HARMON, | ) | |
| | ) | |
| Plaintiffs-Appellees, | ) | |
| | ) | |
| | ) | ON APPEAL FROM THE UNITED |
| v. | ) | STATES DISTRICT COURT FOR |
| | ) | THE SOUTHERN DISTRICT OF |
| HAMILTON COUNTY, OHIO; HAMILTON | ) | OHIO |
| COUNTY BOARD OF COUNTY | ) | |
| COMMISSIONERS; SHERIFF, HAMILTON | ) | |
| COUNTY; HAMILTON COUNTY | ) | |
| SHERIFF'S DEPARTMENT, | ) | |
| Defendants, | ) | |
| | ) | |
| SHAWN COX; RYAN WOLF; MATTHEW | ) | |
| WISSEL; JOHN HAYNES, Patrol Officers, In | ) | |
| their Official and Individual Capacities; | ) | |
| BARBARA STUCKEY, Sergeant, In her | ) | |
| Official and Individual Capacity, | ) | |
| | ) | |
| Defendants-Appellants. | ) | |
| | ) | |

Before: KEITH, COOK, and STRANCH, Circuit Judges.

**DAMON J. KEITH, Circuit Judge.** On October 20, 2009, Plaintiff John Harmon ("Harmon") was driving his vehicle in Anderson Township, Hamilton County, Ohio, when Defendant Deputy Ryan Wolf noticed that he was driving erratically and started to pursue him.

Wolf made a radio call to other officers. Eventually, two other officers—Defendants Deputies John Haynes and Matt Wissell—joined in Wolf's pursuit of Harmon. Once Harmon's vehicle stopped, the officers approached the vehicle, broke the window, tased him, dragged him out, and handcuffed him. More law enforcement officials arrived on the scene at some point, including Defendant Sergeant Barbara Stuckey, Defendant Deputy Shawn Cox and Trooper Sanger. A diabetic kit was later found in Harmon's car. Afterwards, Harmon was charged with failure to comply with an order of a police officer and resisting arrest under Ohio law. Those charges were eventually dismissed.

Harmon and his wife, Stephanie Harmon (together, "Plaintiffs"), sued Defendants for, among other things, violations of the Fourth Amendment—excessive force, false arrest, and malicious prosecution. Defendants moved to dismiss and/or for summary judgment on qualified-immunity grounds, which the district court granted and denied in part. Defendants appeal the denial of summary judgment for the claims of excessive force, false arrest, and malicious prosecution. Because we lack jurisdiction to review these claims, we **DISMISS** this interlocutory appeal.

## I.     FACTUAL BACKGROUND

The district court noted the following relevant facts.

### a.     *Wolf pursues Harmon's vehicle*

"On October 20, 2009 at about 1:15 a.m., Harmon was driving a Ford Expedition vehicle on Clough Pike in Anderson Township, Hamilton County, Ohio." *Harmon v. Hamilton Cty., Ohio*, No. 1:10-CV-911, 2015 WL 5697475, at *1 (S.D. Ohio Sept. 29, 2015). "Harmon has no memory of driving his vehicle at the time." *Id.* He "believes he was suffering a diabetic low blood sugar episode, also referred to as a hypoglycemic reaction, during the time of the

incident." *Id.* According to Harmon, "his cognitive reasoning is diminished when he has an episode, that he is unable to understand when people speak to him, and that he feels like he is 'in a cloud.'" *Id.*

"Wolf was on duty and in uniform patrolling Anderson Township in a marked Sheriff's cruiser when the incident began." *Id.* at \*2. "Wolf testified that he first noticed Harmon when Harmon's vehicle came to an 'abrupt, erratic, screeching stop' at the intersection of Clough Pike and Corbly Road and then accelerated from the intersection in a 'pretty erratic manner.'" *Id.* *"*One of the headlights on [his] vehicle was not working." *Id.* *"*Wolf estimated Harmon to be driving 45 miles per hour on Clough Pike." *Id.* This estimate does not match the finding of the Hamilton County Investigation Report ("HC Investigation Report"). *Id.*

Wolf then "activated his cruiser's lights and siren when he saw Harmon turn right on to Wolfangle Road, then make a quick u-turn which resulted in Harmon driving off the roadway and into a grassy area." *Harmon*, 2015 WL 5697475, at \*2. "Wolf pursued Harmon as he [drove] eastbound on Clough Pike." *Id.* According to Wolf, "Harmon drove at an inconsistent speed, crossed the center line, and crossed onto the shoulder." *Id.* Even though the lights and siren on the cruiser were on, Wolf did not stop or pull over the vehicle to the side of the road. *Id.* *"*Wolf used his radio to inform other officers that he was in pursuit of [Harmon's] vehicle." *Id.*

### b. *Wissel and Haynes also pursue Harmon's vehicle*

"Wissel also was on duty patrolling Anderson Township" on the night of the incident. *Id.* Wissel "ran the license plate number on Harmon's vehicle and saw that it was registered to a downtown Cincinnati business address." *Id.* "Wissel [thought] that the vehicle might have been stolen." *Id.* Wissel then "turned on his lights and siren and attempted to use his cruiser as a roadblock at the intersection of Clough Pike and Nagel Road." *Id.* According to Wissel,

"Harmon did not comply with the roadblock, but drove around it and continued east on Clough Pike." *Id.* Wissel also pursued Harmon's vehicle. *Id.*

"Haynes also was on duty patrolling Anderson Township in a marked Sheriff's car and wearing his uniform." *Id.* "He heard the radio call that a pursuit was in progress, turned on his cruiser's lights and siren, and [also drove] eastbound on Clough Pike to join the pursuit." *Id.*

c. *Harmon's vehicle stops*

"Harmon stopped his vehicle on Clough Pike [,] adjacent to Julifs Park." *Id.* "Wolf and Wissel stopped and exited their cruisers." *Id.* Their weapons were drawn. *Id.* Haynes then pulled up and exited his vehicle. *Id.* "Harmon did not exit his vehicle." *Id.* He then drove the car approximately 200 feet forward to Fireside Drive where he stopped the vehicle. *Id.* Haynes estimates that Harmon was driving at 10 to 15 miles per hour. "Based on a Pursuit Path Overview prepared as part of the HC Investigation Report, Harmon's speed during the pursuit had varied from the low average of approximately two miles per hour to a high average of approximately 26 miles per hour." *Id.*

Wissel ordered Harmon to turn off the vehicle and step out of the car. *Id.* Harmon did not exit the vehicle. *Id.* Wissel and Wolf yelled commands at Harmon. *Id.* "Wissel testified that both of Harmon's hands were in his lap." *Id.* The deputies made their commands for approximately 10 to 15 seconds before they attempted to break the driver side window. *Id.* Although Wissel tried to open the driver's door, he testified that it was locked; so, he struck the window with his CD21 collapsible baton. *Id.* "Wissel did not warn Harmon that he would try to break the window." *Id.* Wissel testified that the driver's door was locked at this time; the HC Investigation Report, however, concludes that it was plausible the driver's door was never locked and not checked prior to breaking the window.

>    *d.    Wolf succeeds in breaking the window and Wissel uses taser.*

"Wissel unsuccessfully tried to break the window with his CD21 baton[.]" *Id.* at *3. "Wolf, however, successfully broke the window with his baton" thereafter, and glass from the window struck Harmon. *Id.* Wissel testified that "Harmon reached with his left hand inside his partially unzipped leather coat towards his right hip after the window broke." *Id.* "Wissel responded by shooting his taser at Harmon, deploying the probes, which attached to the wires carrying the electrical current." *Id.* "The probes did not penetrate Harmon's leather jacket and did not appear to affect Harmon." *Id.* According to Wissel, he reached into the window and unlocked the driver side door – a statement "at odds" with the HC Investigation Report's conclusion that "the door likely was never locked." *Id.* "Haynes opened the driver side door and attempted to pull Harmon from the vehicle." *Id.* "Haynes testified that Harmon did not make a focused attack and did not punch him, but he 'batted and "swatted' at him with his hands when [ ] Haynes tried to unbuckle him. *Id.*

"Wissel fired the taser in drive stun mode to Harmon's knee because he thought Harmon had grabbed [ ] Haynes." *Id.* "Haynes testified that he also deployed his taser in drive stun mode at Harmon's shoulder because he feared Harmon would put the vehicle into gear and drive off with him in it." [1] *Id.* "Haynes did not observe the taser to have any effect."

"The HC Investigation Report concluded that only 20 seconds passed during the time that the officers approached the car, issued verbal commands for Harmon to exit the vehicle, shattered the driver side window, and tased Harmon." *Id.*

>    *e.    Trooper Chris Sanger arrives; Harmon taken to ground; Haynes uses taser.*

Trooper Chris Sanger of the Ohio State Highway Patrol arrived as the deputies were trying to pull Harmon out of the car. *Harmon*, 2015 WL 5697475, at *3. "It did not appear to

---

[1] The drive stun mode does not incapacitate the victim, but causes pain for five seconds. *Id.*

him that Harmon was struggling or pulling back against the deputies." *Id.* Sanger "thought that Harmon could not comply with the commands to get out of the car because his seatbelt was [still] on." *Id.* "Wissel cut the seat belt with a knife." *Id.* "Haynes, Wolf, and Wissel then pulled Harmon from the vehicle." *Id.* "Haynes testified that the deputies ordered Harmon to lie down, but he did not comply." *Id.* Instead, "Harmon stood, tense and rigid." *Id.* Haynes "attempted a leg sweep maneuver [,] which was unsuccessful." *Id.* "He next deployed his taser in drive stun mode to the back of Harmon's neck." *Id.* "He stated it had no visible effect on Harmon." *Id.*

"Harmon was then physically taken to the ground by the three deputies." *Id.* at *4. They ordered Harmon to put his hands behind his back, but Harmon did not comply. *Id.* "Wolf and Wissel had Harmon's left arm outstretched and were trying to move it back, but that Harmon's right arm was underneath his body." *Id.* "Haynes again deployed the taser in stun drive mode to Harmon's lower back." *Id.*

'Trooper Sanger stated that it never appeared to him that Harmon was aggressively fighting or actively resisting." *Id.* "Harmon was not cursing at the officers." *Id.* According to Sanger, "Wolf had Harmon's left arm [with a handcuff on it] in a position out towards the front of his body and was pulling on it upward and away from his body." *Id.* Sanger "thought there would be an easier way to get Harmon's arm behind his back, so he stepped in and took control of Harmon's left arm." *Id.*

   *f. Deputy Shawn Cox arrives; Harmon is treated for injuries and taken to hospital.*

The fifth officer to arrive at the scene, Cox, "was able to secure Harmon's right arm and put it behind his back." *Id.* "Sanger pulled Harmon's left arm behind his back. *Id.* Harmon's arms were then handcuffed behind his back." *Id.* Harmon's right elbow was later found to be

dislocated. *Id.* "He also suffered several cuts and scrapes." *Id.* "Less than three minutes passed between the time that the car window was shattered and the time that Harmon was taken into custody." *Id.*

"Anderson Township Emergency Medical Services treated Harmon at the scene." *Id.* "The officers taking an inventory of Harmon's vehicle found what appeared to be a diabetic insulin kit on the passenger floor board." *Id.* "Harmon's glucose level was 52 after he received one-half tube of glucose orally." *Id.* "A vacuum splint was placed on Harmon's right elbow." *Id.* Harmon advised the medic at the premises "that he did not understand what was happening and he did not remember the events leading up to or during his altercation with the police." *Id.* Harmon was transported to the hospital. *Id.* At the hospital, Harmon was not allowed to use the restroom, and he subsequently urinated on himself while waiting at the triage desk at the hospital. *Id.* "Harmon's dislocated elbow required surgical repair." *Id.*

g. *Calls made to determine whether Harmon should be arrested and charged.*

While at the scene, "Sergeant Stuckey called the night commander, Lieutenant Coyle, to advise him of the taser deployments by the deputies." *Id.* "Sergeant Stuckey called Lieutenant Coyle a second time to advise the supervisor that Harmon was a diabetic." *Id.* "Lieutenant Coyle instructed Sergeant Stuckey to arrest and file charges against Harmon." *Id.* Harmon was charged with resisting arrest and failure to comply with the order of a police officer. *Id.* The next day, Harmon turned himself into the Hamilton County Justice Center. *Id.* Criminal charges were pressed against him, but were later dismissed.

## II.     PROCEDURAL BACKGROUND

Plaintiffs sued Defendants in district court on December 20, 2010. Plaintiffs alleged several counts in the complaint, but the three claims now at issue are: (1) the Fourth Amendment

claim for false arrest; (2) Fourth Amendment claim for malicious prosecution; and (3) Fourth Amendment claim for excessive force. On May 7, 2015, Defendants Wolf, Wissel, Haynes, Cox, and Stuckey filed a motion to dismiss and for summary judgment based on qualified immunity. On September 29, 2015, the district court granted in part and denied in part Defendants' motion as follows: For the excessive-force claim, the district court ruled that while Cox and Stuckey were entitled to qualified immunity, Haynes, Wissel, and Wolf were not. As for the false-arrest claim, the district court ruled that Wolf, Wissel, Haynes, Cox, and Stuckey were not entitled to qualified immunity. And as for malicious prosecution*,* the district court ruled that Cox was entitled to qualified immunity, but Haynes, Stuckey, Wissel, and Wolf were not.

On October 15, 2015, Defendants timely filed this interlocutory appeal. *See* Fed. R. App. P. 4(a).

### III. ANALYSIS

### A. 42 U.S.C. § 1983 and the defense of qualified immunity: analytical framework.

To prevail on his § 1983 claims, Harmon "must establish that a person acting under color of state law deprived [him] of a right secured by the Constitution or laws of the United States." *Smoak v. Hall*, 460 F.3d 768, 777 (6th Cir. 2006) (quoting *Waters v. City of Morristown*, 242 F.3d 353, 358–59 (6th Cir. 2001)). Here, Harmon asserts three separate bases for violations of the Fourth Amendment: (1) excessive force; (2) malicious prosecution; and (3) false arrest.

Harmon may assert "the defense of qualified immunity, which shields government officials from 'liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Smoak*, 460 F.3d at 777 (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). "The plaintiff

carries the burden of proof to show that the defendant is not entitled to qualified immunity." *See v. City of Elyria*, 502 F.3d 484, 491 (6th Cir. 2007) (citing *Wegener v. City of Covington*, 933 F.2d 390, 392 (6th Cir. 1991)).

"In determining whether a law enforcement officer is shielded from civil liability due to qualified immunity, this court typically employs a two-step analysis: '(1) whether, considering the allegations in a light most favorable to the party injured, a constitutional right has been violated, and (2) whether that right was clearly established.'" *Smoak*, 460 F.3d at 777 (quoting *Estate of Carter v. City of Detroit,* 408 F.3d 305, 310 (6th Cir. 2005)). "These questions may be answered in either order." *Goodwin v. City of Painesville*, 781 F.3d 314, 321 (6th Cir. 2015). If the answer to either one is "[no] then qualified immunity protects the officer from civil damages." *Id.*

Before we reach the merits of this appeal, we must first determine whether we may exercise appellate jurisdiction to do so.

## B. APPELLATE JURISDICTION

### i. Jurisdiction over qualified-immunity interlocutory appeals

28 U.S.C. § 1291 limits this court's jurisdiction to "final decisions of the district courts of the United States . . . ." "As the denial of summary judgment is ordinarily not a final decision within the meaning of 28 U.S.C. § 1291, it is generally not immediately appealable." *DiLuzio v. Vill. of Yorkville, Ohio*, 796 F.3d 604, 609 (6th Cir. 2015). But the Supreme Court, in *Mitchell v. Forsyth*, 472 U.S. 511, 530 (1985), explained that the "denial of a claim of qualified immunity, to the extent that it turns on an issue of law, is an appealable 'final decision' within the meaning of 28 U.S.C. § 1291 notwithstanding the absence of a final judgment."

So, "we may decide an appeal challenging the district court's *legal* determination[s]," such as whether, based on the plaintiff's facts, "the defendant's actions violated a constitutional right or that the right was clearly established." *DiLuzio*, 796 F.3d at 609 (citing *Mitchell*, 472 U.S. at 530); *Carter*, 408 F.3d at 310 (noting that the court has jurisdiction over the "purely legal question of whether the facts alleged . . . support a claim of violation of clearly established law") (internal quotation marks and citation omitted). "We may also decide an appeal challenging a *legal* aspect of the district court's factual determinations, such as whether the district court properly assessed the incontrovertible record evidence." *DiLuzio,* 797 F.3d at 609 (citing *Plumhoff v. Rickard*, 134 S. Ct. 2012, 2019 (2014)). Another circumstance in which we may decide an appeal is where the district court's "ruling also hinges on legal errors as to whether the factual disputes (a) are *genuine* and (b) concern *material* facts." *Chappell v. City Of Cleveland*, 585 F.3d 901, 906 (6th Cir. 2009) (citing *Scott v. Harris*, 550 U.S. 372, 378–80 (2007)). "[W]e may [also] decide, as a legal question, an appeal challenging the district court's factual determination insofar as the challenge contests that determination as 'blatantly contradicted by the record, so that no reasonable jury could believe it.'" *Di Luzio*, 796 F.3d at 609 (quoting *Scott*, 550 U.S. at 380; *see also Austin v. Redford Twp. Police Dept.*, 690 F.3d 490, 496 (6th Cir. 2012) ("In exceptional circumstances, an appellate court may overrule a district court's determination that a factual dispute exists where evidence in the record establishes that the determination is 'blatantly and demonstrably false.'")

"We may not, however, decide an appeal challenging the district court's determination of 'evidence sufficiency, *i.e.*, which facts a party may, or may not, be able to prove at trial.'" *DiLuzio*, 796 F.3d at 609 (quoting *Johnson v. Jones*, 515 U.S. 304, 313 (1995)). "[P]rohibited fact-based ('evidence sufficiency') appeals challenge directly the plaintiff's allegations (and the

district court's acceptance) of 'what [actually] occurred [ ] or why an action was taken or omitted,' who did it, or 'nothing more than whether the evidence could support a [jury's] finding that particular conduct occurred.'" *Id.* (alteration in the original) (internal citations omitted). Nor can a defendant "challenge the inferences the district court draws from those facts, as that too is a prohibited fact-based appeal." *Id.* (citing *Romo v. Largen*, 723 F.3d 670, 673–74 (6th Cir. 2013)); *see Romo*, 723 F.3d at 675 (rejecting "'reading' of *Johnson* under which defendants may generally challenge on interlocutory appeal a district court's determination that the summary judgment standard has been met with respect to factual inferences"); *see id.* at 678 (Sutton, J. concurring) (interpreting majority view to be that "when a district court determines that there is a 'genuine issue of fact' for trial by drawing an inference in favor of the plaintiff, the appellate court may not second-guess that inference, indeed lacks jurisdiction to do so."). "As a rule, we either dismiss these fact-based ('evidence sufficiency') appeals for lack of jurisdiction or excise the prohibited challenge." *DiLuzio*, 796 F.3d at 609–10.

In sum, "we may not decide a challenge directly to the district court's determination of the record-supported evidence or the inferences it has drawn therefrom, but we may decide a challenge with any legal aspect to it, *no matter that it might encroach on the district court's fact-based determinations*." *Id.* at 610 (emphasis added); *see also Roberson v. Torres*, 770 F.3d 398, 403 (6th Cir. 2014) ("*Plumhoff* appears to cabin the reach of *Johnson* to 'purely factual issues that the trial court might confront if the case were tried.'" (citation omitted)); *Family Serv. Ass'n v. Wells Twp.*, 783 F.3d 600, 607 (6th Cir. 2015) ("*Johnson* applies to interlocutory appeals that solely contest the plaintiff's account of the facts.").

*Determining jurisdictional scope in practice.* In determining the scope of our jurisdiction, we must "separate an appellant's reviewable challenges from its unreviewable."

*DiLuzio*, 796 at 610 (citations omitted). In earlier decisions, we held a challenge was unreviewable where the appellant failed to "overlook any factual dispute and to concede an interpretation of the facts in the light most favorable to the plaintiff's case." *Berryman v. Rieger*, 150 F.3d 561, 562 (6th Cir. 1998). In recent decisions, however, we clarified that we may still decide appeals that contain a "pure question of law, despite the defendants' failure to concede the plaintiff's version of the facts for purposes of the interlocutory appeal." *Livermore ex rel Rohm v. Lubelan*, 476 F.3d 397, 403 (6th Cir. 2007).[2] In those cases, we can "ignore the defendant's attempts to dispute the facts and nonetheless resolve the legal issue, obviating the need to dismiss the entire appeal for lack of jurisdiction." *DiLuzio*, 796 F.3d at 611 (quoting *Carter*, 408 F.3d at 310); *see also Zurlock v. Shures*, 441 F. App'x 294, 300 (6th Cir. 2010) (stating that the appellate court lacks jurisdiction over "improper arguments" that raise factual disputes and that it may "simply ignore" such arguments); *Harris v. City of Circleville*, 583 F.3d 356, 364 (6th Cir. 2009) ("That the [d]efendants here 'make the occasional factual argument' does not . . . destroy jurisdiction over the legal issues presented.") (citation omitted). Thus, a defendant's failure to concede the plaintiff's version of the facts is not fatal so long as there is a pure question of law that we may review. *See, e.g.*, *McDonald v. Flake*, 814 F.3d 804, 813 (6th Cir. 2016); *McCraig v. Raber*, 515 F. App'x 551, 554 (6th Cir. 2013); *Kirby v. Duva*, 530 F.3d 475, 481 (6th Cir. 2008); *Green v. Taylor*, 239 F. App'x 952, 957 (6th Cir. 2007); *Carter*, 408 F.3d at 310.[3]

In ascertaining which facts are disputed or not, "ideally we need look no further than the district court's opinion for the facts and inferences cited expressly therein." *DiLuzio*, 796 F.3d at

---

[2] A defendant purporting to concede could still fail to concede by "put[ting] the dispositive facts into dispute." *Schmalfeldt v. Roe*, 412 F. App'x 826, 828 (6th Cir. 2011).

[3] It is worth mentioning that a district court's denial of a motion for summary judgment "on the grounds that genuine issues of material fact exist does not necessarily foreclose this Court's jurisdiction over [an] appeal." *See*, 502 F.3d at 490. "Rather, '*regardless of the district court's reasons* for denying qualified immunity, [this Court] may exercise jurisdiction over the [defendant's] appeal to the extent it raises questions of law.'" *Id.* (alteration in the original) (quoting *Williams v. Mehra*, 186 F.3d 685, 689–90 (6th Cir.1999) (en banc)).

611. "That is, in deciding these legal challenges on interlocutory appeal from the denial of qualified immunity, we often may be able merely to adopt the district court's recitation of facts and inferences." *Id.* (citing *Johnson*, 515 U.S. at 319). "Of course, in briefing or arguing for reversal on legal grounds, the defendant-appellant may—indeed, for some arguments, must—point to some other of the plaintiff's record evidence, or some incontrovertible record evidence, to support that argument." *Id.* (citation omitted). "[T]he plaintiff-appellee may point to additional record evidence in support of its position, or to bolster the district court's determination." *Id.* So, "while we need not engage in a plenary review of the record, neither are we limited to only the facts, evidence, or inferences that the district court has stated expressly." *Id.* (citation omitted).[4]

Thus, we must determine whether Defendants have raised prohibited fact-based challenges, and if they have, whether they have also raised pure questions of law over which we may exercise jurisdiction.

### ii. Review of Defendants' Appeal

#### a. Excessive force

Under the Fourth Amendment, "[t]he police must act reasonably when seizing a person." *Rudlaff v. Gillipsie*, 791 F.3d 638, 641 (6th Cir. 2015); *accord* U.S. CONST. amends. IV ("The right of the people to be secure in their persons . . . against unreasonable searches and seizures, shall not be violated . . . ."). "To determine whether the use of force was excessive for purposes of the Fourth Amendment, 'we employ an 'objective reasonableness' test, which requires consideration of the totality of the circumstances.'" *Eldridge v. City of Warren*, 533 F. App'x

---

[4] "It bears mention, however, that, in adopting or accepting the district court's factual determinations for the purpose of deciding this interlocutory appeal, we are not ourselves making any findings of fact or inferences for purposes of any subsequent proceedings." *McDonald*, 814 F.3d at 813 (citing *DiLuzio*, 796 F.3d at 611).

529, 532 (6th Cir. 2013) (quoting *Kijowski v. City of Niles*, 372 F. App'x 595, 598 (6th Cir. 2010)).

"This reasonableness inquiry presents the overarching question of 'whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation.'" *Id.* (quoting *Graham v. Connor*, 490 U.S. 386, 397 (1989)). "The inquiry assesses 'reasonableness at the moment' of the use of force, as 'judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.'" *Goodwin*, 781 F.3d at 321 (quoting *Graham*, 490 U.S. at 396). "Determining whether the amount of force was reasonable 'requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake.'" *Id.* (quoting *Graham*, 490 U.S. at 396).

Three factors—also known as the *Graham* factors—inform this inquiry, although the factors are by no means exhaustive:

> (1) the severity of the crime at issue,
> (2) whether the suspect poses an immediate threat to the safety of the officers or others, and
> (3) whether he is actively resisting arrest or attempting to evade arrest by flight.

*Id.* (citation omitted). "Ultimately, the court must determine 'whether the totality of the circumstances justifies a particular sort of seizure.'" *Id.* (internal citation omitted).

We conclude that Defendants rely on disputed facts at every point in their argument on appeal, divesting this court of appellate jurisdiction over Plaintiffs' excessive force claim. For example, whether the driver's door was locked or not remains a disputed issue. The district court found that Wolf "broke the window with his baton." *Harmon*, 2015 WL 5697475, at *3. The HC Investigation Report noted that it was "plausible the driver's door was never locked and not

checked prior to breaking the window." [5] *Id.* at *2. In relying on this report, the district court observed that "it was probable that the driver side door was unlocked making it unnecessary for . . . Wolf to have shattered the window." *Id.* at *8. The district court concluded that, "[e]xamining the totality of the facts in light most reasonable to [Plaintiffs], [Wolf] unnecessarily shattered his driver's side window without warning." *Id.* at 9. On appeal, Defendants contest the district court's determination that a factual dispute exists, stating, "[t]here is nothing in the record evidence to substantiate that the driver's side door of Harmon's vehicle was unlocked when Wolf broke the window." This is the type of prohibited fact-based challenge that we lack jurisdiction to review and that goes to the heart of whether Wolf's breaking of the window constitutes excessive force. *See, e.g.*, *DiLuzio*, 796 F.3d at 611–12; *see also Coles v. Eagle*, 704 F.3d 624, 630 (9th Cir. 2012) (stating that a genuine issue of material fact existed as to whether officers used excessive force in breaking a car window and pulling arrestee through it, precluding summary judgment on excessive force claim).

Other disputed factual issues—specifically, those that relate to the third *Graham* factor—include whether Harmon was "actively resisting arrest" and whether Defendants' actions

---

[5] The district court ruled that the HC Investigation Report may be relied upon in determining whether there is a genuine issue of material fact. *See Harmon*, 2015 WL 5697475, at *1. Defendants contend that the use of the HC Investigation Report is improper.

Because Defendants failed to contest the district court's ruling on the HC Investigation Report in their opening brief, and instead contested it for the first time in their reply brief, they have waived any such argument that the use of it is improper. *See United States v. Clariot*, 655 F.3d 550, 556 (6th Cir. 2011) ("When a district court resolves an issue, the losing party can challenge it."); *Sanborn v. Parker*, 629 F.3d 554, 579 (6th Cir. 2010) ("We have consistently held . . . that arguments made to us for the first time in a reply brief are waived.") (citing *Am. Trim, L.L.C. v. Oracle Corp.*, 383 F.3d 462, 477 (6th Cir. 2004)).

In any case, we do not get bogged down in evidentiary disputes when reviewing a denial of qualified immunity because *Johnson* precludes us from doing so. *See, e.g.*, *Ellis v. Washington Cty. & Johnson City, Tenn.*, 198 F.3d 225, 229 (6th Cir. 1999). Indeed, even if the piece of evidence constitutes the rankest hearsay and raises a genuine issue of material fact—the resolution of which a constitutional claim depends—then this court must dismiss the appeal for lack of jurisdiction. *See id.* (dismissing appeal even though "the only factual dispute . . . arises from the rankest type of inadmissible hearsay . . . [and] [n]o exception to the hearsay rule would let it in"). Of course, dismissal is not necessary to the extent the qualified-immunity issue is "based on an issue of law." *See Bertl v. City of Westland*, No. 07-2547, 2009 WL 247907, at *4 (6th Cir. Feb. 2, 2009) (resolving appeal notwithstanding evidentiary dispute). Therefore, the admissibility of the HC Investigation Report has no bearing on our analysis in this interlocutory appeal.

precluded Harmon from complying with the orders and commands. *See Goodwin*, 781 F.3d at 321. The district court noted that once Harmon was out of the vehicle, he stood, "tense and rigid." *Harmon*, 2015 WL 5697475, at *3. Haynes "then attempted a leg sweep maneuver which was unsuccessful," and then "deployed his taser in drive stun mode to the back of Harmon's neck." *Id.* This had "no visible effect on Harmon." *Id.* After Harmon was "physically taken to the ground by the three deputies," the deputies "ordered Harmon to put his hands behind his back, but he did not comply." *Id.* at *4. Haynes testified that "Wolf and Wissel had Harmon's left arm outstretched and were trying to move it back, but that Harmon's right arm was underneath his body." *Id.* Haynes "again deployed the taser in stun drive mode to Harmon's lower back." *Id.* Although Haynes "admit[ted] to deploying his taser three times total during the incident . . . the HC Investigation Report indicated that his taser was activated four times in one minute." *Id.* Sanger believed, based on what he saw, that Haynes "did not need to tase Harmon because Harmon was not resisting and there were a sufficient number of officers on the scene to subdue him." *Id.* Further, according to Sanger, "Wolf had Harmon's left arm in a position out towards the front of his body and was pulling on it upward and away from his body." *Id.* Sanger "thought there would be an easier way to get Harmon's arm behind his back, so he stepped in and took control of Harmon's left arm." *Id*. The district court noted that "a reasonable jury might conclude that the officers' uncoordinated efforts to handcuff Harmon made it difficult for Harmon to place his hands behind his back." *Id.* at *8.

But Defendants challenge the district court's inferences. For instance, Defendants argue that Harmon was "refusing to relinquish [his right arm]" when he was on the ground, and thus permitting use of the taser. But that argument directly challenges the district court's observation that a reasonable jury could conclude that "it [was] difficult for Harmon to place his hands

behind his back." *Id.* at *8. Yet again, Defendants' argument is a prohibited fact-based challenge. *See DiLuzio*, 796 F.3d at 609; *Romo*, 723 F.3d at 675. Whether Harmon was refusing to relinquish his right arm or whether he was unable to do so is material to determining whether the use of force employed by Haynes was excessive. *See Caie v. W. Bloomfield Twp.*, 485 F. App'x 92, 97 (6th Cir. 2012) ("[T]here is no dispute that [the] [p]laintiff continued to be uncooperative by actively resisting the officers' attempts to secure his arms behind his back. In light of this resistance, we find that [the officer's] single use of the taser in drive-stun mode was not gratuitous.").

Further, there is a factual dispute as to whether Defendants' actions precluded Harmon from complying with any orders. According to Wissel, "Harmon reached with his left hand inside his partially unzipped leather coat towards his right hip after the window broke." *Harmon*, 2015 WL 5697475, at *3. Wissel "responded by shooting his taser at Harmon, deploying the probes which attached to the wires carrying the electrical current." *Id.* "The probes did not penetrate Harmon's leather jacket and did not appear to affect Harmon." *Id.* Wissel also "fired the taser in drive stun mode to Harmon's knee because he thought Harmon had grabbed . . . Haynes." *Id.* But the HC Investigation Report noted that Harmon's actions when the window was broken should have been anticipated by the officers and that his "[t]urning or reacting as the window was shattered was probably caused by reflex and being showered with broken glass." *Id.* (alteration in the original).[6] The district court reasoned that the facts, if proven at trial could show that Defendants "continued to tase him multiple times for not obeying their verbal orders, but their physical actions impeded his ability to comply." *Id.* at *9. On appeal, Defendants noted that Wissel testified that he deployed the Taser to "counteract the possible

---

[6] Wissel testified that he "then reached into the window and unlocked the driver side door," but that statement, as noted earlier, is "at odds" with the HC Investigative Report. *Harmon*, 2015 WL 5697475, at *3.

production of a weapon." The district court neither accepted nor rejected this particular inference, and we cannot do so on appeal. *See McDonald*, 814 F.3d at 813.

All in all, we have no appellate jurisdiction over these fact-based challenges. Nor do Defendants raise any legal question for us to review, such as whether, based on Plaintiffs' version of the facts, "the district court's legal determination that . . . [Defendants'] actions violated a constitutional right or that the right was clearly established." *See DiLuzio*, 796 F.3d at 609. Therefore, we dismiss Defendants' excessive force interlocutory appeal for lack of appellate jurisdiction.

We now turn to the remaining claims.

### b.  False arrest

"In order for a wrongful arrest claim to succeed under § 1983, a plaintiff must prove that the police lacked probable cause." *Fridley v. Horrighs,* 291 F.3d 867, 872 (6th Cir. 2002). "A police officer has probable cause only when he discovers reasonably reliable information that the suspect has committed a crime." *Gardenhire v. Schubert*, 205 F.3d 303, 318 (6th Cir. 2000). Furthermore, "in obtaining such reliable information, an officer cannot look only at the evidence of guilt while ignoring all exculpatory evidence. Rather, the officer must consider the totality of the circumstances, recognizing both the inculpatory *and* exculpatory evidence, before determining if he has probable cause to make an arrest." *Id.* (citation omitted). "While officers cannot ignore exculpatory facts in reaching a probable cause determination, it is *not* the rule that they must investigate a defendant's legal defenses prior to making an arrest." *Fridley*, 291 F.3d at 874 (emphasis added) (internal citation omitted). Indeed, "[e]ven if the circumstances suggest that a suspect may have an affirmative defense, if a reasonable officer would not 'conclusively know' that the suspect is protected by the defense, then he is free to arrest the suspect provided

there is probable cause to do so." *Young v. Owens*, 577 F. App'x 410, 414 (6th Cir. 2014) (alteration in original) (quoting *Fridley*, 291 F.3d at 873).

A determination of whether probable cause existed requires us to examine the totality of the circumstances, and we may "consider only the information possessed by the arresting officer at the time of the arrest." *Harris v. Bornhorst,* 513 F.3d 503, 511 (6th Cir.), *cert. denied,* 554 U.S. 903 (2008). "A finding of probable cause does not require evidence that is completely convincing or even evidence that would be admissible at trial; all that is required is that the evidence be sufficient to lead a reasonable officer to conclude that the arrestee has committed or is committing a crime." *Id.*

The district court noted that "[i]n general, the existence of probable cause in a § 1983 action presents a jury question, unless there is only one reasonable determination possible." *Harmon*, 2015 WL 5697475, at *9 (quoting *Fridley*, 291 F.3d at 872). And the district court treated the issue as a factual question in which "reasonable jurors could conclude that the officers lacked probable cause to arrest Harmon . . . ." *Harmon*, 2015 WL 5697475, at *9. Defendants offer a contrary view, relying on this court's statement in *Vakilian v. Shaw*, 335 F.3d 509, 517 (6th Cir. 2003) that "[w]here qualified immunity is asserted, the issue of probable cause is one for the court since 'the entitlement is immunity from suit rather than a mere defense to liability.'" It is true that this court has taken seemingly inconsistent views as to whether the existence of probable cause is a question of fact or law.[7] We need not try to resolve these inconsistencies

---

[7] We collected the inconsistent case law in *McKenna v. Edgell*, 617 F.3d 432, 441–42 (6th Cir. 2010) (alterations in original):

> [I]nconsistently, we have at times asked the jury and at times reserved for the court the issue of whether a set of facts provided officers with probable cause. *Compare Parsons v. City of Pontiac*, 533 F.3d 492, 503 (6th Cir. 2008) ("We ultimately conclude that th[e] evidence, when viewed in the light most favorable to [the plaintiff], is *not* susceptible to only one reasonable determination—that the detectives had probable cause to arrest [him]."), and *Radvansky v. City of Olmsted Falls*, 496 F.3d 609, 617 (6th Cir. 2007) ("[T]he jury heard testimony

today. Instead, we conclude that there are factual questions *underlying* the probable-cause determination—separate and apart from the issue of whether probable cause is either legal or factual in nature—that preclude our ability to exercise jurisdiction over the false-arrest claim. *See Hale*, 396 F.3d at 728 ("If disputed factual issues underlying probable cause exist, those issues must be submitted to a jury for the jury to determine the appropriate facts.").

In determining whether there was probable cause to arrest Harmon, we should first determine the elements of the crimes for which Harmon has been charged. *See, e.g.*, *Buchanan v. Metz*, 647 F. App'x 659, 665–66 (6th Cir. 2016); *Amis v. Twardosky*, 637 F. App'x 859, 861–62 (6th Cir. 2015). He was charged with two crimes: "Failure to comply with order or signal of police officer," *see* Ohio Rev. Code Ann. § 2921.331 (West), and "Resisting Arrest," *see id.* § 2921.33(A).

*Resisting Arrest*. The statute for "resisting arrest" provides in relevant part that "[n]o person, recklessly or by force, shall resist or interfere with a lawful arrest of the person or another." Ohio Rev. Code Ann. § 2921.33(A). Wolf averred that "Harmon . . . fail[ed] to get out of his vehicle, when ordered to do so after a short traffic pursuit, refused verbal commands to get on the ground and refused verbal commands to place his hands behind his back." Wolf further alleged that "Harmon did actively struggle and push arresting officers."

---

sufficient to support its conclusion that the officers arrested [the plaintiff] with probable cause."), *and Gardenhire v. Schubert*, 205 F.3d 303, 315 (6th Cir. 2000) ("[W]e must determine whether a jury could conclude that a reasonable officer could have believed that the couple had probably committed or were committing a crime. There is substantial evidence supporting each party's position."), *with Hale v. Kart*, 396 F.3d 721, 728 (6th Cir. 2005) ( "[T]he jury does not decide whether the facts it has found are legally sufficient to amount to probable cause or entitlement to qualified immunity."), *and Ross v. Duggan*, 402 F.3d 575, 585 (6th Cir. 2005) ("[T]he judgment [ ] . . . that pre-arrest probable cause existed on a given set of facts ... is a mixed issue of law and fact reviewed by the courts *de novo*.").

The district court explained that "reasonable jurors could conclude that the officers lacked probable cause to arrest Harmon for resisting arrest . . . because the officers' aggressive actions prevented him from complying." *Harmon*, 2015 WL 5697475, at *9. On appeal, Defendants challenge the district court's determination that a material factual dispute exists as to whether Harmon was resisting or not, noting that Harmon "failed to comply with the attempts of the officers to stop his vehicle, refused to exit the vehicle upon being stopped." As mentioned earlier in our discussion of Plaintiffs' excessive-force claim, a reasonable jury could conclude that the "physical actions [of Defendants] impeded [Harmon's] ability to comply." *Harmon*, 2015 WL 5697475, at *9. Therefore, because of this factual dispute, over which we do not have jurisdiction, *see Johnson*, 515 U.S. at 313, we need to determine whether there is any other record evidence that supports a determination that Defendants had probable cause to arrest Harmon. To that end, it is worth determining whether there is any undisputed record evidence to support that Harmon "fail[ed] to comply with [an] order or signal of a police officer." Ohio Rev. Code Ann. § 7921.331; s*ee also, e.g.*, *Halasah v. City of Kirtland, Ohio*, 574 F. App'x 624, 631 (6th Cir. 2014) ("Even if we assume that there was not probable cause to arrest Halasah for Disorderly Conduct, there was probable cause to arrest Halasah for Obstructing Official Business.").

*Failure to comply with order or signal of police officer*. This statute for "failure to comply with order or signal of police officer" provides as follows:

> (B) No person shall operate a motor vehicle so as willfully to elude
> or flee a police officer after receiving a visible or audible signal
> from a police officer to bring the person's motor vehicle to a stop.

Ohio Rev. Code Ann. § 2921.331 (West).

On appeal, Defendants argue that they were confronted with "an erratic driver violating traffic laws who did not comply with the cruiser lights and sirens or with the roadblock created

to stop him."[8]   The problem with Defendants' argument is that it ignores the use of the word "willfully" in the statute.  *See, e.g.*, *Williams v. City of Alexander, Ark.*, 772 F.3d 1307, 1312 (8th Cir. 2014) ("For probable cause to exist, there must be probable cause for all elements of the crime, including *mens rea*.").  As the Ohio Court of Appeals explained, the term "willfully," as used in this statute, connotes a sense of "purpose[]."  *State v. Garrard*, 867 N.E.2d 887, 893–94 (Ohio Ct. App. 2007).  Ohio Rev. Code. Ann § 2901.22 provides:

> (A) A person acts purposely when it is his specific intention to cause a certain result, or, when the gist of the offense is a prohibition against conduct of a certain nature, regardless of what the offender intends to accomplish thereby, it is his specific intention to engage in conduct of that nature.

*Garrard*, 867 N.E.2d at 893–94.  "Proof of intent may be derived from circumstantial evidence, as direct evidence will seldom be available. Circumstantial evidence is the proof of facts by direct evidence from which the trier of fact may infer or derive by reasoning other facts in accordance with the common experience of mankind."  *Id.* at 894 (internal quotation marks and citation omitted).  Whether there is some evidence in the record that supports that Harmon acted "willfully" is a factual inference that we cannot make on appeal.  *See, e.g.*, *Reynolds v. Snider*, 279 F. App'x 389, 390 (6th Cir. 2008) (dismissing appeal of denial of summary judgment as to false arrest claim because of the "factual dispute about the motive, purpose and intent of the officers").

In sum, because of the factual dispute underlying the probable cause determination, and Defendants' failure to present any legal question, we lack appellate jurisdiction over Defendants' false arrest appeal.

---

[8] The district court explained that "reasonable jurors could conclude that the officers lacked probable cause to arrest Harmon after they discovered the diabetic insulin kit."  *Harmon*, 2015 WL 5697475, at *9.  "Examining the facts in a light most favorable to Harmon, reasonable jurors could conclude that he had been suffering a diabetic attack when he committed the traffic violations."  *Id.*

*c. Malicious prosecution*

The elements of a malicious prosecution claim under Sixth Circuit law are as follows:

> (1)     the plaintiff must show that a criminal prosecution was initiated against the plaintiff and that the defendant made, influenced, or participated in the decision to prosecute;
>
> (2)     because a § 1983 claim is premised on the violation of a constitutional right, the plaintiff must show that there was a lack of probable cause for the criminal prosecution;
>
> (3)     the plaintiff must show that, as a consequence of a legal proceeding, the plaintiff suffered a deprivation of liberty, as understood in [this court's] Fourth Amendment jurisprudence, apart from the initial seizure.
>
> (4)     the criminal proceeding must have been resolved in the plaintiff's favor.

*Sykes v. Anderson*, 625 F.3d 294, 308–09 (6th Cir. 2010) (internal citations and quotation marks omitted). As mentioned earlier, there were two criminal charges in this case: one for resisting arrest, Ohio Rev. Code 2921.33(A), and the other for failure to comply with order or signal of police officer, Ohio Rev. Code. 2921.33(B).

As for malicious prosecution, courts have held that the existence of probable cause forecloses a finding of malicious prosecution. *See Provience v. City of Detroit*, 529 F. App'x 661, 668 (6th Cir. 2013) ("Because Provience has not made the required showing that there was a lack of probable cause for the criminal prosecution, Sergeant Moore is also entitled to qualified immunity on the malicious-prosecution claim."); *Watson v. City of Marysville*, 518 F. App'x 390, 392 (6th Cir. 2013) ("Additionally, '[t]he existence of probable cause for an arrest totally precludes any section 1983 claim for unlawful arrest, false imprisonment, or malicious prosecution . . . .") (quoting *Mark v. Furay*, 769 F.2d 1266, 1269 (7th Cir. 1985)). The district

court stated that the "[r]easonable jurors could conclude that Defendants lacked probable cause to prosecute Harmon." *Harmon*, 2015 WL 5697475, at *10.

Because of the factual dispute underlying the probable cause determination, and Defendants' failure to present any legal question, we lack appellate jurisdiction over Defendants' malicious prosecution appeal.

## IV. CONCLUSION

Because Defendants' arguments rest on factual disputes and because Defendants raise no pure question of law, we accordingly **DISMISS** this appeal for lack of appellate jurisdiction.